## - IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| ATLAS DATA PRIVACY CORPORATION, et al.,<br><br>Plaintiffs,<br>v.<br><br>ACCUZIP, INC., et al.,<br><br>Defendants. | Civ. Action No. 24-04383-HB |
| ATLAS DATA PRIVACY CORPORATION, et al.,<br><br>Plaintiffs,<br>v.<br><br>JOY ROCKWELL ENTERPRISES, INC., et al.,<br><br>Defendants. | Civ. Action No. 24-04389-HB |
| ATLAS DATA PRIVACY CORPORATION, et al.,<br><br>Plaintiffs,<br>v.<br><br>THE ALESCO GROUP, L.L.C.<br><br>Defendants. | Civ. Action No. 24-05656-HB |
| ATLAS DATA PRIVACY CORPORATION, et al.,<br><br>Plaintiffs,<br>v.<br><br>SEARCHBUG, INC.<br><br>Defendants. | Civ. Action No. 24-05658-HB |

ATLAS DATA PRIVACY
CORPORATION, et al.,

                Plaintiffs,

v.                                       Civ. Action No. 24-07324-HB

US DATA CORPORATION, et al.,

                Defendants.

ATLAS DATA PRIVACY
CORPORATION, et al.,

                Plaintiffs,

v.                                       Civ. Action No. 24-10600-HB

DARKOWL, et al.,

                Defendants.

---

## PLAINTIFFS' BRIEF IN SUPPORT OF THEIR OMNIBUS MOTION TO DISMISS COUNTERCLAIMS PURSUANT TO RULE 12(b)(6)

**PEM LAW LLP**
Rajiv D. Parikh
Kathleen Barnett Einhorn
Jessica A. Merejo
One Boland Drive, Suite 101
West Orange, New Jersey 07052
Telephone (973) 577-5500
Emails: rparikh@pemlawfirm.com
         keinhorn@pemlawfirm.com
         jmerejo@pemlawfirm.com

**BIRD MARELLA RHOW
LINCENBERG DROOKS NESSIM LLP**
Ekwan E. Rhow (admitted *pro hac vice*)
Elliot C. Harvey Schatmeier (admitted *pro hac vice*)
Bill L. Clawges (admitted *pro hac vice*)
1875 Century Park East, 23rd Fl
Los Angeles, California 90067
Telephone: (310) 201-2100
Email: erhow@birdmarella.com
       ehs@birdmarella.com
       bclawges@birdmarella.com

*Attorneys for Plaintiffs*

# **TABLE OF CONTENTS**

PRELIMINARY STATEMENT………………………………………….……...1

ORGANIZATION OF OMNIBUS MOTION TO DISMISS……………………...3

FACTUAL BACKGROUND…………………………………………………………4

I.   Daniel's Law Is Enacted to Protect the Unpublished Home Addresses and Telephone Numbers of Judges, Law Enforcement Officers, Prosecutors and Their Families. .......................................................................................................4

II.  Plaintiffs Sue Counterclaim Plaintiffs for Violating Daniel's Law by Disclosing Home Addresses and Telephone Numbers of Judges, Law Enforcement Officers and Prosecutors.....................................................................................................4

III. The Counterclaim Plaintiffs Retaliate Against Covered Persons .......................6

LEGAL STANDARDS ........................................................................................11

ARGUMENT…………………………………………………………...…11

I.   The Counterclaim Plaintiffs Each Fail to State a Claim for Violations of the Computer Related Offenses Act ("CROA") .....................................................11

   A.   Counterclaim Plaintiffs each fail to adequately allege taking or damaging computer data.........................................................................................12

      1.  Inadequate allegations of taking computer data. ............................13

      2.  Inadequate allegations of damaging computer data ........................15

   B.   Insufficient allegations of damage to business or property.................19

II.  Counterclaim Plaintiffs Fail to Plead Tortious Interference ...........................23

   A.   Counterclaim Plaintiffs do not allege expected economic benefit with the requisite specificity.................................................................................25

   B.   No allegations that Atlas was aware of any business relationship.......26

   C.   Counterclaim Plaintiffs do not allege that they would have received the anticipated economic benefit, but for the interference.........................27

III. DarkOwl, JoyBird and US Data Fail to Allege Fraud......................................29

   A.   Representations to Atlas's customers.................................................30

   B.   Misrepresentations that Assignors Are "Covered Persons."...............32

   C.   Misrepresentations based on access to Counterclaim Plaintiffs' data. 35

IV. DarkOwl, Alesco, PCM, SearchBug and US Data Each Fail to Plead a   Viable Civil Conspiracy Claim. ....................................................................................37

CONCLUSION……………………………………………………………………39

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

Am. Millennium Ins. Co. v. First Keystone Risk Retention Grp., Inc.,
  332 F. App'x 787 (3d Cir. 2009) .........................................................................25

Ashcroft v. Iqbal,
  556 U.S. 662 (2009).............................................................................11, 13, 14

Austar Int'l Ltd. v. AustarPharma LLC,
  425 F. Supp. 3d 336 (D.N.J. 2019) ....................................................................25

Avaya Inc., RP v. Telecom Labs, Inc.,
  838 F.3d 354 (3d Cir. 2016) ..............................................................................24

B&M Auto Salvage & Towing, LLC v. T'ship of Fairfield,
  C.A. No. 11–2107, 2013 WL 5434717 (D.N.J. Sept. 13, 2013) .......................28

Beauvil v. City of Asbury Park,
  2018 WL 2455928 (D.N.J. June 1, 2018)...........................................................38

Bell Atl. Corp. v. Twombly,
  550 U.S. 544 (2007)...............................................................................11, 13

Bramshill Invs., LLC v. Pullen,
  No. CV 19-18288, 2020 WL 4581827 (D.N.J. Aug. 10, 2020) ...................19, 21

Caspersen as Trustee for Samuel M.W. Caspersen Dynasty Trust v. Oring,
  441 F.Supp.3d 23 (D.N.J. 2020).........................................................................30

Castro v. Sanofi Pasteur Inc.,
  No. CV 11-7178 (JLL), 2012 WL 12516573 (D.N.J. Dec. 20, 2012) .........22, 23

CC Ford Grp. W., LLC v. Johnson,
  C.A. No. No. 22-4143, 2025 WL 1810206 (D.N.J. June 30, 2025).............12, 27

Clapper v. Amnesty Int'l USA,
  568 U.S. 398 (2013).............................................................................................23

CMC Food, Inc. v. Mitlitsky Eggs, LLC,
  C.A. 18-8939, 2019 WL 5206104 (D.N.J. October 16, 2019) ...........................25

i

Consol. Data Terminals v. Applied Digital Data Sys., Inc.,
    708 F.2d 385 (9th Cir. 1983) ...............................................................................22

Craftmatic Sec. Litig. v. Kraftsow,
    890 F.2d 628 (3d Cir. 1989) ................................................................................30

D'Agostino v Wilson,
    2019 WL 5168621 (D.N.J. Oct. 11, 2019) ..........................................................38

DiGiorgio Corp. v. Mendez & Co.,
    230 F. Supp. 2d 552 (D.N.J. 2002) ......................................................................26

Durr Mech. Constr., Inc. v. PSEG Fossil, LLC,
    516 F. Supp. 3d 407 (D.N.J. 2021)......................................................................26

Eli Lilly and Co. v. Roussel Corp.,
    23 F.Supp.2d 460 (D.N.J. 1998).........................................................................37

EP Henry Corp v. Cambridge Pavers, Inc.,
    C.A. No. 17–1538, 2017 WL 4948064 (D.N.J. Oct. 31, 2017).........................35

Frederico v. Home Depot,
    507 F.3d 188 (3d Cir. 2007) ................................................................................29

Goydos v. Rutgers, State Univ.,
    No. CV1908966GCDEA, 2024 WL 1329253 (D.N.J. Mar. 28, 2024)........12, 18

Hong Kong Ibesttouch Tech. Co. v. iDistribute LLC,
    No. CV 17-2441(FLW), 2018 WL 2427128 (D.N.J. May 30, 2018).................24

Johnson v. Draeger Safety Diagnostics, Inc.,
    2013 WL 3788937 (D.N.J. July 19, 2013) ..........................................................34

LS-NJ Port Imperial LLC v. A.O. Smith Water Prods. Co.,
    No. 22CV1687 (EP) (JSA), 2022 WL 17547269 (D.N.J. Dec. 8, 2022) ...........33

Magic Reimbursements LLC v. T-Mobile USA, Inc.,
    C.A. No. 22-02121, 2023 WL 4866930 (D.N.J. July 31, 2023) ........................25

McLaughlin v. Bayer Corp.,
    No. CV 14-7315, 2017 WL 697047 (E.D. Pa. Feb. 21, 2017) ...........................22

Melone v. Cryoport Inc.,
    No. CV 23-3243 (MAS) (JBD), 2024 WL 1743108 (D.N.J. Apr. 23,
    2024) ................................................................................................32

In re Nickelodeon Consumer Priv. Litig.,
    No. CIV.A. 12-07829, 2014 WL 3012873 (D.N.J. July 2, 2014) ...............11, 20

In re Nickelodeon Consumer Privacy Litig.,
    827 F.3d at 278 ...................................................................................15

P.C. Yonkers, Inc. v. Celebrations the Party and Seasonal Superstore,
    LLC.,
    428 F.3d 504 (3d Cir. 2005) ..............................................................14

Patel v. Zoompass Holdings, Inc.,
    2019 WL 6912701 (D.N.J. May 14, 2019)........................................33

United States, ex rel. Pilecki–Simko v. Chubb Inst.,
    443 Fed. Appx. 754 (3d Cir.2011).....................................................33

In re Suprema Specialties, Inc. Sec. Litig.,
    438 F.3d 256,282 (3d Cir.2006) ........................................................34

Tsereteli v. Residential Asset Securitization Trust 2006–A8,
    692 F.Supp.2d 387 (S.D.N.Y. 2010) .................................................33

Wiatt v. Winston & Strawn LLP,
    838 F. Supp. 2d 296 (D.N.J. 2012)....................................................38

Woodend v. Lenape Regional High School Dist.,
    535 Fed. App'x 164 (3d Cir. 2013) ...................................................28

Zahl v. New Jersey Dept. of Law and Public Safety,
    C.A. No. 06–3749, 2010 WL 3810530 (D.N.J. Sept. 21, 2010) .......37

**State Cases**

DepoLink Ct. Reporting & Litig. Support Servs. v. Rochman,
    430 N.J. Super. 325 (App. Div. 2013)...............................................33

Hoffman v. Hampshire Labs, Inc.,
    405 N.J. Super. 105 (App. Div. 2009)........................................32, 36

<u>Spencer Sav. Bank SLA v. McGrover</u>,
   No. 1899-13T3, 2015 WL 966151 (N.J. Super. Ct. App. Div. Mar. 15,
   2015) ......................................................................................................21

**<u>Federal Statutes</u>**

Computer Related Offenses Act .......................................................*passim*

Daniel's Law ....................................................................................*passim*

Computer Fraud and Abuse Act ...........................................................12

**<u>State Statutes</u>**

N.J.S.A. 56:8-166.1 ...........................................................................4, 31

N.J. Stat. Ann. § 2A:38A-3 ....................................................................17

**<u>Other Authorities</u>**

Fed. R. Civ. 12(b)(6) .........................................................................11, 37

Fed. R. Civ. P. 9(b) ...........................................................................29, 34

Rule 8 ................................................................................................34, 36

Rule 9 ................................................................................................29, 36

## PRELIMINARY STATEMENT

At least twelve months after Atlas Data Privacy Corporation (as assignee for Covered Persons) ("Atlas") and certain individual plaintiffs sued DarkOwl, AccuZIP, Alesco, Joy Rockwell Enterprises, Inc. ("PCM"), SearchBug, and US Data (collectively "Counterclaim Plaintiffs") in separate lawsuits under Daniel's Law for disclosing protected home addresses and unpublished phone numbers of New Jersey judges, law enforcement officers, prosecutors, and their families, Counterclaim Plaintiffs each filed meritless counterclaims against Atlas—and against the Individual Plaintiff law enforcement officers—in retribution for asserting their rights. Each of Counterclaim Plaintiffs' vindictive claims is based on trussed-up grousing about Covered Persons' necessary pre-litigation activities. In particular, most of the claims are based on the allegations that (1) during a short period of time, Atlas facilitated the transmission of up to thousands of required Daniel's Law nondisclosure emails by Covered Persons per day (because the emails were sent on behalf of nearly 20,000 covered persons), which somehow damaged Counterclaim Plaintiffs' systems and businesses; and (2) Atlas somehow accessed Counterclaim Plaintiffs' data and used it (solely) to confirm that Counterclaim Plaintiffs were continuing to violate the statute by disclosing protected information of covered persons, which Counterclaim Plaintiffs contend was wrongful on the basis that Atlas was not one of their customers. Unsurprisingly, New Jersey law does not allow well-

1

heeled counsel to target a litigation adversary in this manner in a desultory effort to manufacture claims based on acts taken to assert and protect legal rights. Because Counterclaim Plaintiffs do not and cannot meet the pleading requirements for any of their causes of action, the Court should grant Atlas's Omnibus Motion to Dismiss.

Specifically, Counterclaim Plaintiffs bring claims for (1) violations of the Computer Related Offenses Act ("CROA") (an anti-computer hacking law that requires a plaintiff to show damage to its business or property); (2) tortious interference; (3) fraud; and (4) civil conspiracy. But their allegations are entirely conclusory. Counterclaim Plaintiffs allege that Atlas damaged their computer systems, but do not explain the nature of any such damage or how it could have been caused by Atlas's conduct. They allege that their business was disrupted but do not explain how. They allege that they lost current and prospective customers, but they do not identify any specific customers, and several of the Counterclaim Plaintiffs admit that they *voluntarily* ceased doing business in New Jersey. They allege that Atlas made misrepresentations but do not allege facts to demonstrate the statements were actually false, nor how they relied on any misrepresentations. They allege civil conspiracy but do not identify any parties that Atlas conspired with.

Tellingly, while the counterclaims purport to target the conduct of Atlas and the significant volume of emails transmitted by Covered Persons using its platform, the Counterclaim Plaintiffs nonetheless seek damages from the Individual Plaintiffs

too without distinction. The fact that the Counterclaim Plaintiffs have decided to pursue claims against covered persons, without any explanation of how their conduct supposedly caused any harm, reflects that the counterclaims are nothing more than an attempt to retaliate against Atlas – and the Individual Plaintiffs – for bringing their legitimate Daniel's Law suit. In short, Counterclaim Plaintiffs' conclusory allegations regarding damages they suffered from Atlas's ordinary pre-litigation conduct are shoe-horned into causes of action that are not intended to, and do not, cover such conduct. The claims should be dismissed without leave to amend.

## **ORGANIZATION OF OMNIBUS MOTION TO DISMISS**

Counterclaim Plaintiffs are each represented by the same law firm and the counterclaims that they have filed are substantially similar (with minor differences in certain instances). To minimize repetition, Plaintiffs shall focus on DarkOwl's counterclaims as an example, largely citing in footnotes any similar allegations from the other counterclaims. Where there are differences in the counterclaims, Plaintiffs will note those differences and address them as needed. To make it easier to navigate this Omnibus Motion to Dismiss, Plaintiffs have provided a chart summarizing the various counterclaims as **Exhibit A**.

## FACTUAL BACKGROUND

**I.    Daniel's Law Was Enacted to Protect the Unpublished Home Addresses and Telephone Numbers of Judges, Law Enforcement Officers, Prosecutors and Their Families.**

After Daniel Anderl, the son of a New Jersey federal judge was murdered by an individual disgruntled over certain legal cases, who obtained the home address of his victim through people finder resources on the Internet, New Jersey enacted Daniel's Law in November 2020.  DarkOwl Compl. ¶¶ 5-7.  Daniel's Law allows current and former New Jersey public servants, such as judges, law enforcement officers, and prosecutors, and their immediate family ("covered persons"), to send written nondisclosure requests to individuals and businesses demanding that the recipients not disclose or make available the covered person's home address or unlisted telephone number.  N.J.S.A. 56:8-166.1.  If the person or business discloses or continues to make available this information after 10 business days from receiving the request, they have violated Daniel's Law.  Daniel's Law also allows covered persons to assign their rights under the statute to another person or entity.  N.J.S.A. 56:8-166.1(b), (d).

**II.    Plaintiffs Sue Counterclaim Plaintiffs for Violating Daniel's Law by Disclosing Home Addresses and Telephone Numbers of Judges, Law Enforcement Officers and Prosecutors.**

Plaintiffs Patrick Colligan and Peter Andreyev are police officers in different NJ municipalities with a combined 64 years of experience.  DarkOwl Compl. ¶¶ 18-

19.[1] Plaintiff Atlas Data Privacy Corporation was assigned claims by more than

19,000 Covered Persons for violating Daniel's Law. Id. ¶ 21.[2] Starting on or about

December 30, 2023, each of the Individual Plaintiffs and 19,040 covered persons

sent DarkOwl written nondisclosure requests via email in accordance with Daniel's

Law, using Atlas Mail. Id. ¶ 49.[3] DarkOwl continued to disclose or re-disclose on

the internet or otherwise make available the protected information of the Individual

Plaintiffs and covered persons after the time period required by Daniel's Law. Id.

¶¶ 59-60.[4] Indeed, DarkOwl continued to make disclosures in violation of Daniel's

---

[1]      While Atlas is a Plaintiff (as assignee on behalf of tens of thousands of covered persons) in each of the cases at issue in this Motion, the Individual Plaintiffs (who are also covered persons) vary. AccuZIP Compl. ¶¶ 15-17 (Edwin Maldonado, Patrick Colligan, and Peter Andreyev); Alesco Compl. ¶¶ 15-21 (Jane Doe-1, Jane Doe-2, Scott Maloney, Justyna Maloney, and William Sullivan); PCM Compl. ¶¶ 15-24 (Jane Doe-1, Jane Doe-2, Scott Maloney, Justyna Maloney, and William Sullivan, Edwin Maldonado, Patrick Colligan, and Peter Andreyev); Searchbug Compl. ¶¶ 15-24 (same); US Data Compl. ¶¶ 15-21 (same).

[2]      AccuZIP Compl. ¶ 19 (19,601 assignors); Alesco Compl. ¶ 23 (19,849 assignors); PCM Compl. ¶ (19,250 assignors); Searchbug Compl. ¶ (19,522 assignors); US Data ¶ 26 (19,727 assignors).

[3]      AccuZIP Compl. ¶ 44 (starting on or about January 10, 2024)); Alesco Compl. ¶ 52 (starting on or about January 19, 2024); PCM Compl. ¶ 51 (starting on or about December 30, 2023); Searchbug Compl. ¶ 52 (starting on or about January 6, 2024); US Data Compl. ¶ 51 (starting on or about January 17, 2024).

[4]      So did the other Counterclaim Plaintiffs. AccuZIP Compl. ¶ 56; Alesco Compl. ¶¶ 61-62; PCM Compl. ¶¶ 60-61; Searchbug Compl. ¶¶ 61-62; US Data Compl. ¶¶ 59-60.

Law more than ten months after the written nondisclosure requests had been sent. Id. ¶ 52.[5]

On or about October 16, 2025, about ten months after the non-disclosure requests had been sent, Atlas and the Individual Plaintiffs filed a lawsuit in Superior Court in New Jersey against DarkOwl for violations of Daniel's Law on behalf of Individual Plaintiffs and all 19,040 covered persons who assigned their claims to Atlas. See DarkOwl Counterclaims n.1.[6] DarkOwl subsequently removed the case to federal court. Id.

### III.    The Counterclaim Plaintiffs Retaliate Against Covered Persons

On October 3, 2025, nearly a year after Plaintiffs' suit, DarkOwl brought counterclaims for violations of the CROA, tortious interference, fraud, and civil conspiracy. See Dkt. No. 54. Below is a summary of its allegations.

DarkOwl alleges that it "provides cybersecurity services including Government Cybersecurity Solutions, Threat Intelligence Services, Fraud

---

[5]    The remaining complaints were filed approximately thirty to sixty days after the nondisclosure requests were sent. At the time of the filing of those complaints, those defendants had yet to comply with Daniel's Law regarding the nondisclosure requests. AccuZIP Compl. ¶ 56; Alesco Compl. ¶¶ 61-62; PCM Compl. ¶¶ 60-61; Searchbug Compl. ¶¶ 61-62; US Data Compl. ¶¶ 59-60.
[6]    In the other cases, the counterclaims were filed approximately 21-22 months after the nondisclosure requests were sent. AccuZIP Dkt. No. 69 ("AccuZIP Counterclaims"), n.1; Alesco Dkt. No. 62 ("Alesco Counterclaims"), n.1; PCM Dkt. No. 68 ("PCM Counterclaims"), n.2; SearchBug Dkt. No. 62 ("SearchBug Counterclaims"), n.1; US Data Dkt. No. 58 ("US Data Counterclaims"), n.1.

Protection, Digital Identity Protection, National Security Services, and similar threat

intelligence and security services." DarkOwl Counterclaims ¶ 1.[7]  It alleges that it

is not a "data broker," though it does not define that term.[8]  Id. ¶ 10.  It claims that

it neither has "a 'data broker' website nor a 'people search website.'"  Id. ¶ 10.[9]  It

does, however, admit that it provides a "computer-based platform and tools for

safely navigating information obtained from the darknet."  Id. ¶ 33.[10]  Its database

---

[7]    The other Counterclaim Plaintiffs also operate data businesses according to their counterclaims. AccuZIP "enable[s] companies to validate addresses against the official USPS database." AccuZIP Counterclaims ¶ 1. Searchbug is an investigator of public records engaging primarily in business-to-business telecommunications verification and some data scrubbing." Searchbug Counterclaims ¶ 1. PCM is a "business-to-business direct mail and marketing company primarily providing services to businesses through the design and mailing of postcards."  PCM Counterclaims ¶ 1. Alesco is a "business-to-business data solutions, marketing, and privacy company."  Alesco Counterclaims ¶ 1.  US Data "provides business-to-business direct marketing services specializing in providing marketing solutions, marketing lists, and data services." US Data Counterclaims ¶ 1.

[8]    See also Alesco Counterclaims ¶ 19; PCM Counterclaims ¶ 16.

[9]    See also Alesco Counterclaims ¶ 19; PCM Counterclaims ¶ 16.

[10]   AccuZIP Counterclaims ¶ 32 ("AccuZIP provides software and services" that "help[] companies validate addresses against the USPS database, correct errors, remove duplicate entries, and standardize addresses to meet USPS requirements."); PCM Counterclaims ¶ 39 ("PCM engages in business-to-business direct mail and digital marketing primarily through the design and mailing of postcards. PCM does so, in part, through postcardmania.com."); Searchbug Counterclaims ¶ 37 (Searchbug "is a data facilitator" that "provides its customers' access to databases owned and operated by other vendors whose data is accessed through an API (Application Programming Interface) when a user enters requested information."); US Data Counterclaims ¶ 1 (US Data "provides services via interstate computer services" related to "business-to-business direct marketing services specializing in providing marketing solutions, marketing lists, and data services."); Alesco Counterclaims ¶ 1 (stating "Alesco provides services via interstate computer services").

houses information from "data breaches and cyber-attacks" and "is updated from tens of thousands of sites across multiple darknets and darknet adjacent sites every day." Id.[11]

DarkOwl concedes that Atlas "signed up thousands of alleged covered persons" to assign their rights to Atlas and to send out nondisclosure requests using its platform, ultimately leading to nondisclosure requests for over 19,000 individuals. Id. ¶¶ 8, 13.[12] It alleges that Atlas' website states that it provides services to help people remove their "'information from Google and data broker websites.'" Id. ¶ 9. It further alleges that Atlas provided the Assignors in this case with a "preset list of target companies" to send nondisclosure requests, which Atlas automatically generated for the Assignors when they selected to send their request to DarkOwl. Id. ¶ 8, 11.[13] DarkOwl claims that Atlas did not verify whether these individuals were actually covered persons under Daniel's Law. Id. ¶ 13.[14] DarkOwl

---

[11]    See also AccuZIP Counterclaims ¶ 18 (boasting about developing "innovative software" that "integrates seamlessly" with USPS and has earned a special certification).

[12]    See AccuZIP Counterclaims ¶¶ 10, 13; Alesco Counterclaims ¶¶ 11, 14; PCM Counterclaims ¶¶ 14, 19; Searchbug Counterclaims ¶¶ 14, 17; US Data Counterclaims ¶¶ 14, 17.

[13]    See AccuZIP Counterclaims ¶¶ 10-11 (similar allegations); Alesco Counterclaims ¶¶ 11-12 (same); PCM Counterclaims ¶¶ 14, 17 (same); Searchbug Counterclaims ¶¶ 14-15 (same); US Data Counterclaims ¶¶ 14-15 (same).

[14]    See AccuZIP Counterclaims ¶ 16 (similar allegations); Alesco Counterclaims ¶ 16 (same); PCM Counterclaims ¶ 21 (same); Searchbug Counterclaims ¶ 19 (same); US Data Counterclaims ¶ 19 (same).

states that Atlas emailed it approximately 48,000 nondisclosure requests over the course of a week, about 7,000 per day. Id. ¶ 26.[15] It claims that it received a different nondisclosure request for each individual piece of information that was being requested to be taken down, which sometimes resulted in multiple requests from the same Assignor "(e.g., one email for an address, one email for a phone number, one email for an alternate phone number)." Id. ¶ 22.[16]

DarkOwl alleges that sending such a high volume of emails was an attempt by Atlas to overload and damage its electronic systems. Id. ¶ 22. It states that it "suffered harm including, but not limited to, its computer systems" and "its email system." Id. ¶ 47. It does not allege the nature or extent of the injury, including spending money to fix the injury, how long it took to repair the injury, or the difficulty in repairing it. See generally Counterclaims.[17] In terms of business damages, it claims to have "suffered significant distraction from business,

---

[15]    See AccuZIP Counterclaims ¶ 47 (similar allegations); Alesco Counterclaims ¶ 35 (same); PCM Counterclaims ¶ 32 (same); Searchbug Counterclaims ¶ 50 (same); US Data Counterclaims ¶ 47 (same).

[16]    See AccuZIP Counterclaims ¶ 42 (similar allegations); Alesco Counterclaims ¶ 31 (same); PCM Counterclaims ¶ 28 (same); Searchbug Counterclaims ¶ 46 (same); US Data Counterclaims ¶ 43 (same).

[17]    AccuZIP and Alesco also allege the high volume of emails caused a generalized harm. AccuZIP Counterclaims ¶¶ 42, 55; Alesco Counterclaims ¶¶ 31, 50. US Data, PCM, and Searchbug allege that they expended costs to respond to Daniel's Law requests, but to not explain why such costs are attributable to any tortious conduct. See US Data Counterclaims ¶¶ 43, 61, 63; PCM Counterclaims ¶ 61; Searchbug Counterclaims ¶ 70.

disruption, and expenditures of resources in response to the attack." Id. ¶ 31.  The resources expended are not alleged to be financial, and the nature of this "distraction" and "disruption" are not described.[18]  Significantly, DarkOwl alleges that because of Atlas's actions, it is "refusing to sell its product to New Jersey police and law enforcement agencies and to any cybersecurity companies based in New Jersey since the start of the instant litigation."  Id. ¶ 46.[19]

Finally, DarkOwl notes that Plaintiffs' Complaint included a screenshot from DarkOwl's platform.  Id. ¶ 41.  It alleges that a hack or improper use of a customer's credentials are the only ways that Plaintiffs could have gained access to this platform because neither Atlas nor the Individual Plaintiffs are customers of DarkOwl.  Id. ¶¶ 43, 81.[20]  However, DarkOwl does not allege that the police departments of the Individual Plaintiffs are not its customers nor that an agent of Atlas could not have legitimately signed up for use of its platform, nor does it allege that its agreements with users prohibit its customers from sharing information. See generally id.

---

[18]    See AccuZIP Counterclaims ¶¶ 76-77 (alleging similar general disruption); Alesco Counterclaims ¶ 72 (same); PCM ¶ 82 (same); Searchbug ¶ 79 (same); US Data Counterclaims ¶ 85.

[19]    PCM Counterclaims ¶ 82 ("Atlas's actions . . . caused PCM to cease providing services in and related to New Jersey"); US Data Counterclaims ¶ 85 (same for US Data).

[20]    See Alesco Counterclaims ¶ 46; PCM Counterclaims ¶ 58; Searchbug Counterclaims ¶ 62; US Data Counterclaims ¶ 58; AccuZIP ¶ 52 (generally alleging unauthorized access, in contrast to the other Counterclaimants, who allege unauthorized access through hacking or improper use of credentials).

## LEGAL STANDARDS

A claim must be dismissed under Fed. R. Civ. 12(b)(6) if it fails to plead "enough facts to state a claim to relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007). The pleadings must raise the right to relief beyond a speculative level; "labels and conclusions" are not enough "and a formulaic recitation of the elements of a cause of action will not do." Id. at 555 (internal quotation marks omitted). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009). It is equally insufficient to allege a "mere possibility of misconduct." Id. at 679. Instead, a complaint must "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is *plausible* on its face.'" Id. at 678 (internal quotation marks omitted). "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of 'entitlement to relief.'" Id.

## ARGUMENT

### I. The Counterclaim Plaintiffs Each Fail to State a Claim for Violations of the Computer Related Offenses Act ("CROA")

The CROA is an anti-computer hacking statute. In re Nickelodeon Consumer Priv. Litig., No. CIV.A. 12-07829, 2014 WL 3012873, at *18 (D.N.J. July 2, 2014). A CROA claim "requires the following two elements: (1) an actor must take or damage computer data without authorization, and (2) the Plaintiff must have been

damaged in business or property as a result of the prohibited conduct." <u>Goydos v.</u>
<u>Rutgers, State Univ.</u>, No. CV1908966GCDEA, 2024 WL 1329253, at *6 (D.N.J.
Mar. 28, 2024) (internal quotation marks omitted).  The CROA also requires that the
defendant's actions are "purposeful or knowing."  <u>Id.</u> (quoting N.J. Stat. Ann. §
2A:38A-3).  The Counterclaim Plaintiffs' allegations satisfy none of these required
elements.[21]

>  **A. Counterclaim Plaintiffs each fail to adequately allege taking or
>     damaging computer data.**

Each of the Counterclaim Plaintiffs asserts two different – and equally
implausible – theories that Atlas[22] took or damaged their computer data without
authorization.

---

[21]     AccuZIP, Alesco, PCM and US Data also bring claims under the federal
Computer Fraud and Abuse Act (CFAA).  See PCM Counterclaims Count 1,
AccuZIP Counterclaims Count 1; US Data Counterclaims Count 1; Alesco
Counterclaims Count 1.  The "Third Circuit generally treats the CROA and CFAA
similarly", except that the CFAA has an additional independent loss threshold.  <u>CC</u>
<u>Ford Grp. W., LLC v. Johnson</u>, C.A. No. No. 22-4143, 2025 WL 1810206, at *17
(D.N.J. June 30, 2025) (discussing $5,000 loss element in CFAA private cause of
action).  The CFAA claims thus fail for the same reasons as the CROA
claims.  AccuZIP's, Alesco's and PCM's claims fail for the additional reason that
they do not allege any factual allegations to support their conclusory assertion that
their losses "exceed 5,000 in value during a one-year period."

[22]     While the CROA claims are ostensibly brought against all Plaintiffs, each of
the allegations under Count 1 pertain only to Atlas.  Because DarkOwl alleges no
conduct on the part of the Individual Plaintiffs, the CROA claims against them must
be dismissed.

## 1. *Inadequate allegations of taking computer data.*

First, each of the Counterclaim Plaintiffs asserts a theory under the "taking" prong. For example, DarkOwl alleges that Atlas provided a screenshot of data from DarkOwl in their complaint, that Atlas is not a DarkOwl customer, and then speculates that the only way Atlas could have gotten access to this information was by "hacking into" DarkOwl's system or fraudulently accessing its system "through one or more of DarkOwl's customers." DarkOwl Counterclaims ¶¶ 41-43.[23] But "where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of 'entitlement to relief.'" Iqbal, 556 U.S. at 678. The plausibility requirement is not met where there are alternative, lawful explanations for the conduct at issue. See Twombly, 550 U.S. at 568 (dismissing complaint for failure to plead plausible claim when there was an "obvious alternative explanation" that was not illegal).

Here, the conclusion that Plaintiffs could have only gotten access to this information by hacking into a system or by fraudulently accessing its system through

---

[23] The other Counterclaim Plaintiffs do not allege that Atlas took their data through a screenshot. They merely allege that in order for Atlas to know whether they are disclosing the protected information of covered persons, Atlas must have obtained access to their systems fraudulently because Atlas is not a customer. See e.g. Alesco Counterclaims ¶¶ 45-47; PCM Counterclaims ¶¶ 57-59; Searchbug Counterclaims ¶¶ 61-63; US Data Counterclaims ¶¶ 57-59; AccuZIP Counterclaims ¶¶ 52-53 (alleging unauthorized access without alleging Atlas was not a customer) This theory is even more far-fetched than DarkOwl's theory and fails for the same reasons.

13

a customer does not cross the line from possibility to plausibility because there are many legitimate ways Atlas could have accessed DarkOwl's data.  For example, Atlas's agent could have legitimately signed up to use DarkOwl's platform and then provided Atlas with the information in their Complaint.  Indeed, DarkOwl does not allege that a legitimate customer would violate its terms and conditions by sharing data it receives from DarkOwl,[24] let alone that Atlas would have any knowledge of DarkOwl's terms and conditions.  See DarkOwl Counterclaims ¶ 37 (discussing process for accessing DarkOwl). [25]  Because there are "obvious alternative explanation[s]" for Atlas having this screenshot that do not involve unlawfully "taking" DarkOwl's data, DarkOwl has not plausibly stated a claim for violation of the CROA.  See e.g. Iqbal, 556 U.S. at 678 (explaining that "sheer possibility that a defendant has acted unlawfully" is insufficient and holding that allegations were implausible "given more likely explanations" for the challenged actions).

In any event, a claim under the CROA "require[s] proof of some activity vis-à-vis the information other than simply gaining access to it," P.C. Yonkers, Inc. v. Celebrations the Party and Seasonal Superstore, LLC., 428 F.3d 504, 509 (3d Cir.

---

[24]    DarkOwl does not allege any specific provisions in its terms and conditions.
[25]    While PCM alleges that its terms and conditions limit access and use to the customer, and US Data alleges that its terms and conditions prohibit disclosure to any "employees of the Client for use in the Client's business or as contemplated on the face of this Invoice," they do not allege that Atlas knew about these terms and conditions, and therefore cannot show that Atlas purposefully or knowingly violated these terms and conditions.

14

2005), in particular, seeking to monetize the accessed information, In re Nickelodeon Consumer Privacy Litig., 827 F.3d at 278. Here, the only thing that DarkOwl alleges that Atlas did with DarkOwl's data is use it to confirm the Daniel's Law violations at the heart of this lawsuit and use it in a legal Complaint. That is not activity contemplated by the CROA. See In re Nickelodeon Consumer Privacy Litig., 827 F.3d at 278 (discussing monetizing data by participating in the marketplace for the sale of the information). Indeed, DarkOwl's theory of liability – that using a screenshot of its data violates the CROA – is deeply problematic. If merely accessing its data to confirm compliance with the law is a violation, there would be no legitimate way to determine whether DarkOwl was in compliance with Daniel's Law via a private right of action. This Court should decline to insulate from liability actors like DarkOwl who disclose home addresses and unpublished telephone numbers of law enforcement personnel, judges, and prosecutors to only their private customers.

### 2. *Inadequate allegations of damaging computer data*

Counterclaim Plaintiffs' second theory – that Plaintiffs "damag[ed]" their computer data without authorization – fares no better. This theory is based on the claim that Atlas sent thousands of Daniel's Law takedown requests per day until a takedown request was sent for each category of protected information for each of the nearly 20,000 covered persons. For example, DarkOwl alleges that Atlas sent

approximately 7,000 takedown requests by email each day over a seven-day period. Id. ¶ 26.[26]  It claims that this had "the *appearance* of" a cyber-attack.  Id. ¶ 31 (emphasis added).  DarkOwl further states generically and implausibly that it "suffered harm" in "its computer systems and its email systems, its business, and other damages related to the same."  Id. ¶ 47.  As an initial matter, this theory is nonsensical.  DarkOwl's Counterclaim concedes that there was no *actual* attack, just the appearance of one.  Even accepting DarkOwl's allegation that Atlas sent the emails as true (which is wrong),[27] these were legitimate, ordinary emails with a

---

[26]    The allegations of the other Counterclaim Plaintiffs are substantially similar, with only minor variations in the number of requests sent, and the days over which the requests were sent.  Alesco Counterclaims ¶¶ 34, 35 (47,479 or 49,106 emails on behalf of about 19,000 assignors between January 19-26, 2024); AccuZIP Counterclaims ¶¶ 44, 45 (48,499 or 48,507 emails on behalf of about 19,000 assignors sent "in early January of 2024); Searchbug Counterclaims ¶¶ 49, 50 (48,294 or 48,302 emails sent on behalf of about 19,000 assignors from January 6-13, 2024); PCM Counterclaims ¶¶ 31, 32 (47,624 or 47,632 emails sent on behalf of about 19,000 assignors between December 30, 2023 and January 5, 2024); US Data Counterclaims ¶¶ 46, 47 (48,294 or 48,302 emails sent on behalf of about 19,000 assignors between January 6-13, 2024).  AccuZIP, Alesco, SearchBug and PCM further allege that the nondisclosure emails were wrongful because they have their own opt-out processes.  AccuZIP Counterclaims ¶ 20; Alesco Counterclaims ¶ 21; PCM Counterclaims ¶¶ 24-25; Searchbug Counterclaims ¶¶ 27-28 (also alleging that Atlas used a defunct email address and had used a correct email address earlier without alleging that Atlas knew that the email address it used was defunct).  But Daniel's Law only requires "written notice"; it does not require the use of such opt out procedures.  Moreover, the mere fact that these companies provide other ways to communicate nondisclosure requests does not render it unlawful to send "written notice" via email.

[27]    In reality, as described in extensive detail in Atlas's Complaint, the assignors, not Atlas, sent the emails.  DarkOwl Complaint ¶ 29, 30, 31, 50, 51.

genuine communicative purpose – to assert rights under Daniel's Law requesting that protected information no longer be disclosed. That DarkOwl received *thousands* of emails is simply a function of the fact that thousands of covered persons sought to assert their rights. Unsurprisingly, under these circumstances, its claims based on sending of these communicative emails do not satisfy the elements of the CROA.

*First*, DarkOwl does not specify how the systems of a cybersecurity company could possibly have been harmed merely through the receipt of a large volume of ordinary emails. As discussed below in Section I(B), this lack of detail is fatal to this theory.

*Second,* even if DarkOwl adequately alleged damages to its email and computer systems (which it did not), it failed to adequately allege that Plaintiffs sent these emails "without authorization" or that the damage was "purposeful or knowing," as the CROA requires. N.J. Stat. Ann. § 2A:38A-3. DarkOwl does not explain how sending communicative emails (which are required by law) to a public email address designated by DarkOwl for that purpose (even in large quantities) was "without authorization." For example, DarkOwl does not allege that there were any public warnings regarding the number of emails that it could be sent or over what period of time (and there were no such warnings). In fact, by DarkOwl's own allegations, there were only an average of 2.5 emails per covered person, and only a

single email per piece of protected information.  See DarkOwl Counterclaims ¶¶ 25, 26.  This is hardly excessive.

And DarkOwl's boilerplate allegation that "Atlas acted purposefully and/or knowingly" is a mere legal conclusion. [28]  DarkOwl Counterclaims ¶¶ 49-50. DarkOwl's failure to substantiate this conclusion with factual allegations to make it plausible is fatal.  Goydos, 2024 WL 1329253, at *6 (insufficient to merely allege "legal recitations of a CROA claim—that 'by his actions, Goydos purposefully and/or knowingly engaged in the unauthorized access to a computer . . .").  Indeed, DarkOwl's factual allegations actually demonstrate that Atlas *could not have* acted with the requisite scienter.  DarkOwl brags that it scours "tens of thousands of sites across multiple darknets and darknet adjacent sites" to update its platform daily. Counterclaims ¶ 33.  In other words, DarkOwl is a technologically sophisticated actor, capable of handling and analyzing enormous amounts of data.  There was no way for Plaintiffs to have known that sending one email per piece of information that should be removed (as few as 2.5 emails per Covered Person) would be an unauthorized use of DarkOwl's public email account, nor that DarkOwl's

---

[28]    AccuZIP Counterclaims ¶¶ 58-59 (similar allegation); Alesco Counterclaims ¶¶ 61-62 (same); PCM Counterclaims ¶¶ 72-73 (same); Searchbug Counterclaims ¶¶ 68-69 (same); AccuZIP Counterclaims ¶¶ 74-75 (same).

sophisticated systems could be harmed just by sending a few thousand emails a day over the course of a week.[29]

### B. Insufficient allegations of damage to business or property.

Counterclaim Plaintiffs' CROA claims also fail because they do not allege plausible damages to business or property, the second element of a CROA claim. For example, DarkOwl identifies two categories of damages – damages to its systems and damages to its business – neither of which is supported by any factual allegations whatsoever.

DarkOwl's allegations regarding damage to its *systems* are entirely conclusory. DarkOwl does not explain what specifically was damaged, the nature of the damage, any repairs, for how long it was damaged, or the cost of repairing the damage. DarkOwl alleges only that these systems were "harm[ed]." DarkOwl Counterclaims ¶ 47.[30] The law is clear that such conclusory allegations of harm are insufficient. See Bramshill Invs., LLC v. Pullen, No. CV 19-18288, 2020 WL

---

[29]    Atlas does not understand DarkOwl's complaint that the emails were sent "specifically during the winter holiday season." DarkOwl Counterclaims ¶ 27. These emails were delivered to DarkOwl beginning on December 30, 2023, and continuing for multiple days (including multiple business days). Id. ¶ 26. DarkOwl does not allege that it takes its systems offline over the holidays, and most companies continue to operate during "the winter holiday season." The other Counterclaim Plaintiffs make similar complaints. AccuZIP Counterclaims ¶ 36; Alesco Counterclaims ¶ 35; PCM ¶¶ 32-35; Searchbug ¶ 50; US Data Counterclaims ¶ 40.
[30]    AccuZIP Counterclaims ¶ 55; Alesco Counterclaims ¶ 50; PCM ¶ 62; Searchbug Counterclaims ¶ 66; US Data Counterclaims ¶ 63.

4581827, at *5 (D.N.J. Aug. 10, 2020) (dismissing CROA claim because "the Amended Complaint merely consists of various unsupported and conclusory allegations claiming that Plaintiff has suffered damages"); In re Nickelodeon Consumer Priv. Litig., 2014 WL 3012873, at *18 (determining the complaint was "devoid of factual allegations regarding the 'business or property' damage Plaintiffs have suffered as a result of Defendant" and holding that "[w]ithout allegations demonstrating plausible damage to 'business or property,' Plaintiffs cannot state a claim for relief under the CROA.").

DarkOwl's conclusory allegations that it "suffered significant distraction from business, disruption, and expenditures of resources in response to the attack," Counterclaims ¶ 31, are likewise insufficient because it does not provide adequate factual allegations from which the Court could reasonably infer that it has suffered such damages to its business.[31]    Without more, such a conclusory allegation is

---

[31]    See also AccuZIP Counterclaims ¶ 60 ("operational disruption from Atlas's email blasts . . . overwhelmed AccuZIP's support system," "prevented timely access to legitimate customer inquiries," "risked crashing AccuZIP's mail servers and exhausting storage capacity," and led to "other forced emergency response measures necessitated by Atlas' actions"); Alesco ¶ 72 (not alleging disruption in CROA claim but alleging in fraud claim that "Atlas's actions in this regard inhibited Alesco's ability to service their customers and potential customers, caused massive disruption to services, and among other things, caused Alesco significant business interruptions and losses"). PCM, Searchbug, and US Data similarly allege that processing the nondisclosure requests resulted in costs as resources were diverted to respond to requests. PCM Counterclaims ¶ 61; Searchbug Counterclaims ¶ 70; US Data Counterclaims ¶ 61. But these allegations are still insufficient because they appear

insufficient to withstand a motion to dismiss." <u>Bramshill Investments</u>, 2020 WL 4581827, at *5 (dismissing CROA claims where plaintiff conclusorily pled "loss of reputation good-will from existing and prospective clients"). Moreover, to the extent that DarkOwl is attempting to recover damages for the time it spent investigating whether the nondisclosure requests were hostile to its systems, such damages are not cognizable under the CROA. <u>Bramshill Investments</u>, No. CV 19-18288, 2020 WL 4581827, at *5 (rejecting investigative costs as "damage[s] in business or property" in dismissing CROA claim); <u>see also</u> <u>Spencer Sav. Bank SLA v. McGrover</u>, No. 1899-13T3, 2015 WL 966151, at *7 (N.J. Super. Ct. App. Div. Mar. 15, 2015) ("costs of investigation" not cognizable under CROA).

It is unclear whether DarkOwl seeks purported damages to its business under the CROA based on DarkOwl "refusing to sell its product to New Jersey police and law enforcement agencies and to any cybersecurity companies based in New Jersey since the start of the instant litigation." DarkOwl Counterclaims ¶ 46.[32] If so, such damage is not cognizable because it was not caused by Atlas. It was DarkOwl's decision to cease operating in New Jersey that caused any losses from its refusal to

_____

to be costs that would have been incurred from processing nondisclosure requests, i.e., complying with Daniel's Law. Those are not recoverable costs in this lawsuit.

[32]    <u>See</u> <u>also</u> PCM ¶ 82 (Atlas "caused PCM to cease providing services in and related to New Jersey."); US Data ¶ 62 ("US Data was forced to cease accepting new business for New Jersey data since Atlas launched its attack.").

sell there.  See <u>Consol. Data Terminals v. Applied Dig. Data Sys., Inc.</u>, 708 F.2d 385, 394 (9th Cir. 1983) ("Profits 'lost' from a completely voluntary and independent business decision are not 'caused' in a legally cognizable sense by conduct that merely supplies some contributing factors underlying the decision.").

DarkOwl also does not explain how or why nondisclosure requests that have *already been* sent could cause DarkOwl's later decision to not participate in this market.  Such "vague and non-specific allegations of causation do not raise a right to relief above the speculative level." <u>McLaughlin v. Bayer Corp.</u>, No. CV 14-7315, 2017 WL 697047, at *18 (E.D. Pa. Feb. 21, 2017) (dismissing negligent manufacturing claim because it failed to explain how the negligence caused the harm beyond merely alleging that it did); <u>Castro v. Sanofi Pasteur Inc.</u>, No. CV 11-7178 (JLL), 2012 WL 12516573, at *7 (D.N.J. Dec. 20, 2012) (alleging in antitrust case that competitors left the market because of anticompetitive conduct insufficient: "there are a number of reasons why certain vaccine manufacturers may be unable to compete").  Moreover, DarkOwl does not contend that it stopped selling its product in New Jersey after the emails were sent.  See DarkOwl Counterclaims ¶ 46.  Instead, it contends that DarkOwl stopped selling its product "since the start of the instant litigation" approximately ten months after the emails.

Id.[33]  In other words, DarkOwl withdrew from the New Jersey market because it was sued there.

## II.    Counterclaim Plaintiffs Fail to Plead Tortious Interference

Counterclaim Plaintiffs' claims for tortious interference are based on Atlas's purported "misrepresentations" and the email nondisclosure requests. Counterclaims ¶ 59.[34]  There are two (largely overlapping) types of tortious interference:  (1) tortious interference with prospective business relations; and (2) tortious interference with a contract.  Because Counterclaim Plaintiffs do not identify any specific customers or contracts that were lost and any lost business appears to

---

[33]    In addition, if an injury caused by withdrawing from the marketplace is the only injury DarkOwl suffered, DarkOwl may lack Article III standing to assert this claim.  DarkOwl "cannot manufacture standing merely by inflicting harm on [itself] based on [its] fears of hypothetical future harm that is not certainly impending."  Clapper v. Amnesty Int'l USA, 568 U.S. 398, 416, (2013) (expenditures made to avoid unlawful government surveillance were insufficient to confer standing because such surveillance was not certainly impending).  The Supreme Court reasoned that the "[i]f the law were otherwise, an enterprising plaintiff would be able to secure a lower standard for Article III standing simply by making an expenditure based on a nonparanoid fear."  Id.  Here, DarkOwl inflicted harm on itself by electing to stop doing business in New Jersey.  And DarkOwl does not allege that it terminated its New Jersey businesses to avoid any certainly impending harm because it does not and cannot allege that Plaintiffs would have continued to engage in the conduct that it challenges in this case.  To the contrary, as noted, the nondisclosure request emails to DarkOwl ceased nearly ten months before DarkOwl took any action to stop selling to the New Jersey market. Because DarkOwl's self-inflicted injury is not fairly traceable to Atlas's actions, it does not have standing to pursue losses related to its refusal to sell in New Jersey.

[34]    The tortious interference claims are *not* based on the screenshot of DarkOwl data.

be due to their own voluntary decisions to leave the New Jersey market, Counterclaim Plaintiffs do not and cannot state a claim for tortious interference.

The "Supreme Court of New Jersey [has] held that, in a claim of tortious interference with prospective business advantage, what is actionable is the luring away, by devious, improper and unrighteous means, of the customer of another.'" Avaya Inc., RP v. Telecom Labs, Inc., 838 F.3d 354, 382 (3d Cir. 2016) (cleaned up). "Under New Jersey law, to properly state a claim for tortious interference with prospective economic benefit, a party must plead the following elements: (1) it had a reasonable expectation of an economic benefit; (2) the non-movant's knowledge of that expectancy; (3) wrongful, intentional interference with that expectancy; (4) the reasonable probability that the claimant would have received the anticipated economic benefit, but for the interference; and (5) damages resulting from such interference." Hong Kong Ibesttouch Tech. Co. v. iDistribute LLC, No. CV 17-2441(FLW), 2018 WL 2427128, at *3 (D.N.J. May 30, 2018) (citing Third Circuit and NJ Supreme Court authority). "Similarly, to sufficiently plead a claim of tortious interference with a contract, a party must allege the same elements as a claim for tortious interference with a prospective economic benefit, plus the additional element of a contract. Id. at *3-4. Counterclaim Plaintiffs fail to adequately allege at least three of these required elements: (1) a reasonable expectation of an economic benefit and/or contract; (2) Atlas's knowledge of that

expectancy; and (3) the reasonable probability that the claimant would have received the anticipated economic benefit, but for the interference.[35]

### A. Counterclaim Plaintiffs do not allege expected economic benefit with the requisite specificity.

Under Iqbal/Twombly, federal courts applying New Jersey law require a plaintiff to identify a *specific* prospective customer or contract that it lost or could have acquired to plead a claim for tortious interference. See e.g., CMC Food, Inc. v. Mitlitsky Eggs, LLC, C.A. 18-8939, 2019 WL 5206104, at *8-9 and n.12 (D.N.J. October 16, 2019) (holding that identification of single specific lost customer sufficient to meet this standard) (emphasis added); Am. Millennium Ins. Co. v. First Keystone Risk Retention Grp., Inc., 332 F. App'x 787, 790 (3d Cir. 2009) (affirming district court's dismissal of plaintiff's tortious interference claim where the "complaint fail[ed] to identify a single, specific customer that [plaintiff] either lost or could have acquired but for [defendants'] conduct"); Austar Int'l Ltd. v. AustarPharma LLC, 425 F. Supp. 3d 336, 358 (D.N.J. 2019) ("A plaintiff need not identify multiple lost business opportunities to establish a cause of action for tortious interference, but it must identify one.").[36]  Taking DarkOwl's claims as the

---

[35]    Because Count Two contains no allegations pertaining to the Individual Plaintiffs, the tortious interference claims must be dismissed as to them.

[36]    Before Iqbal/Twombly, there was a line of federal cases that did not require the identification of specific customers/contracts but, as numerous district courts have acknowledged, that line of cases is no longer good law.  See e.g., Magic

exemplar, DarkOwl alleges only that DarkOwl "cease[d] providing services to certain current customers and certain prospective customers." DarkOwl Counterclaims ¶ 62.[37] DarkOwl does not identify a single specific prospective customer or contract that was actually lost and thus DarkOwl does not state a claim for tortious interference under Iqbal/Twombly.

### B. No allegations that Atlas was aware of any business relationship

Counterclaim Plaintiffs' failure to identify a single specific lost customer or contract also dooms the second element of a tortious interference claim, which requires proof that a defendant knew about the <u>specific</u> relationship that it was interfering with; "[g]eneral knowledge of a business relationship is not sufficient." <u>DiGiorgio Corp. v. Mendez & Co.</u>, 230 F. Supp. 2d 552, 564 (D.N.J. 2002); <u>Durr Mech. Constr., Inc. v. PSEG Fossil, LLC</u>, 516 F. Supp. 3d 407, 422 (D.N.J. 2021) ("To intentionally interfere with prospective advantage, a defendant must have knowledge of a specific contract and intend to interfere with that contract. Allegations that a defendant intended to interfere with a category of contracts or a

---

Reimbursements LLC v. T-Mobile USA, Inc., C.A. No. 22-02121, 2023 WL 4866930, at *8-9 (D.N.J. July 31, 2023) (collecting cases).

[37]    PCM Counterclaims ¶ 83 (PCM ceased providing services "to certain customers, both current and prospective"); US Data Counterclaims ¶ 62 ("US Data was forced to cease accepting new business for New Jersey data since Atlas launched its attack."); Alesco Counterclaims ¶¶ 72-73 (unidentified "current and prospective customers");; US Data Counterclaims ¶¶ 81-85 (unidentified "customers and prospective customers"); Searchbug Counterclaims ¶¶ 79-80 (unidentified "customers and potential customers"); AccuZIP Counterclaims ¶¶ 75-77 (same).

plaintiff's business more generally are not enough – a tortious interference claim requires more targeted actions.") (cleaned up).

Here, DarkOwl alleges only generically that "Atlas knew of DarkOwl's economic relationships and reasonable expectation of economic advantage with its current and prospective customers." Counterclaims ¶ 58.[38] DarkOwl does not allege that any of the Plaintiffs had any specific knowledge of its economic relationships or current or prospective customers with which they allegedly sought to interfere. These allegations are plainly insufficient under Third Circuit precedent. See CC Ford Grp. W., LLC v. Johnson, 2025 WL 1810206, at *20 (D.N.J. June 30, 2025) (dismissing tortious interference claims because plaintiffs failed to allege that "Defendants had actual knowledge of any of CCFW's relationships and/or contracts with Johnson, Bicking, Weiler, Albireo, and Merz").

### C. Counterclaim Plaintiffs do not allege that they would have received the anticipated economic benefit, but for the interference.

Counterclaim Plaintiffs should not be given leave to amend this claim because their affirmative allegations make clear that they *cannot* show that any loss of business (future or existing) was caused by any conduct by Plaintiffs.[39] Looking at

---

[38] AccuZIP Counterclaims ¶ 75 (same allegation); Alesco Counterclaims ¶ 70 (same allegation); Searchbug ¶ 77 (same allegation); US Data ¶ 83 (same allegation).
[39] AccuZIP, Alesco, and SearchBug do not allege that they voluntarily left the New Jersey market but they also fail to establish this element because they do not

DarkOwl's claims, DarkOwl alleges that it was DarkOwl's *voluntary* decision to "cease providing services to current customers and certain prospective customers" and "deny services to certain customers, both current and prospective." Counterclaims ¶¶ 60-61; <u>see also</u> <u>id.</u> ¶ 46 (Atlas's conduct "has resulted in DarkOwl refusing to sell its product to New Jersey police and law enforcement agencies and to any cybersecurity companies based in New Jersey since the start of the instant litigation"). And New Jersey law is clear that a tortious interference claim does not cover a plaintiff's voluntary actions – even if the voluntary decision is allegedly prompted by a defendant's conduct. <u>See e.g.</u>, <u>Woodend v. Lenape Regional High School Dist.</u>, 535 Fed. App'x 164, 167-68 (3d Cir. 2013) (affirming dismissal of tortious interference with employment contract where plaintiff voluntarily resigned because defendant's "conduct could not have caused a loss of future gain because the loss was caused by Woodland's voluntary resignation"); <u>B&M Auto Salvage & Towing, LLC v. T'ship of Fairfield</u>, C.A. No. 11–2107, 2013 WL 5434717, at *7 (D.N.J. Sept. 13, 2013) (The Hoffmans claim against Township for tortious interference with their sales contract by not processing license application needed for sale failed because Mr. Hoffman "voluntarily canceled his contract."). [40]

---

explain how emails sent over a week's period or misrepresentations to those that were not customers could have caused them to lose existing or prospective business.

[40] PCM and US Data also allege that they voluntarily decided to leave the New Jersey market. PCM Counterclaims ¶ 82; US Data Counterclaims ¶ 85.

DarkOwl and the other Counterclaim Plaintiffs' tortious interference claim necessarily fails because any lost business was due to its own actions.

### III.    DarkOwl, JoyBird and US Data Fail to Allege Fraud.

For their fraud claims, DarkOwl, PCM and US Data[41] each allege three separate theories of fraudulent misrepresentations: (1) representations made to *Atlas's customers* about Atlas and the services offered by DarkOwl, PCM and US Data; (2) representations made to DarkOwl, PCM and US Data that takedown requests were sent by "covered persons;" and (3) representations made by Atlas or someone else to gain access to DarkOwl, PCM and US Data's systems.  These fraud claims must be dismissed because the de minimis factual allegations in support of each of the theories do not meet Rule 9's heightened pleading standard.

Under Rule 9, a party must "state with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b).  Rule 9(b)'s requirements are "stringent." Frederico v. Home Depot, 507 F.3d 188, 200-01 (3d Cir. 2007).  Allegations must include "the who, what, when, where and how of the events at issue."  U.S. ex rel. Moore & Co., P.A. v. Majestic Blue Fisheries, LLC, 812 F.3d 294, 307 (3d Cir. 2016) (citations omitted).  "[P]recision and some measure of substantiation" is essential for allegations of fraud,  In re Rockefeller Ctr. Props., Inc. Sec. Litig., 311 F.3d 198, 216 (3d Cir. 2002) (cleaned up), in order to "ensure that defendants are

---

[41]    None of the other Counterclaim Plaintiffs allege fraud claims.

placed on notice of the precise misconduct with which they are charged, and to safeguard defendants against spurious charges of fraud," Craftmatic Sec. Litig. v. Kraftsow, 890 F.2d 628, 645 (3d Cir. 1989) (cleaned up).

"The elements of fraud are: false representation, scienter, materiality, expectation of reliance, justifiable reliance, and damage." Caspersen as Trustee for Samuel M.W. Caspersen Dynasty Trust v. Oring, 441 F. Supp. 3d 23, 38 (D.N.J. 2020). As discussed below on a theory-by-theory basis (using DarkOwl's claims as the exemplar), none of these elements have been alleged with particularity.[42]

### A. Representations to Atlas's customers.

DarkOwl alleges a theory of fraud based on two separate statements made to *others* (not DarkOwl) that it contends are untrue.  But of course, as the elements make clear, a fraud claim is not meant to penalize every untrue statement – merely those purposefully untrue statements that a plaintiff justifiably relies on to its detriment.  DarkOwl cannot make these necessary showings with statements that, at best, only others who are not plaintiffs relied on.

Specifically, DarkOwl alleges that Atlas misrepresented to its customers that (1) Atlas was acting to "'remov[e] your information from Google and data broker websites,' and misrepresented that it provided information and services necessary

---

[42]    Again, while the fraud claim purports to be brought against all Plaintiffs, none of the allegations in Count 3 are directed at Individual Plaintiffs, and as such, the fraud claims should be dismissed as to Individual Plaintiffs.

for same," id. ¶ 73; and (2) DarkOwl was a "data broker," who "makes available" personal data over "the Web," and who has a "people search website," id. ¶ 72. Not only does DarkOwl not allege any facts from which a court could conclude either of these representations were untrue,[43] the representations were not made to DarkOwl, and DarkOwl does not and cannot allege any justifiable reliance on these statements. After all, DarkOwl did not sign up with Atlas and DarkOwl identifies no actions that *it* took in reliance on these statements. To the contrary, DarkOwl specifically alleges that representations about it and Atlas deceived Individual Plaintiffs and Assignors, not DarkOwl. Id. ¶ 10 (misrepresentation "allow[ed] [Atlas] to sign-up tens of thousands of Assignors"). In any event, DarkOwl could not have relied on Atlas misstatements about *DarkOwl* when DarkOwl knows the details of its own business.

Along these same lines, DarkOwl's fraud claim based on these representations also fails because DarkOwl does not (and cannot) allege any facts from which it can be concluded that DarkOwl suffered damages from these purported misrepresentations to *others*.

---

[43]     For example, while DarkOwl claims it is not a website, it concedes that it is a "computer-based platform" that "scours the darknet for information." DarkOwl Counterclaims ¶ 33. And it does not and cannot allege that the unlisted telephone numbers and home addresses of covered persons were not accessible on its platforms. See generally DarkOwl Counterclaims. In addition, the purportedly false representations about DarkOwl are also not material because Daniel's Law never uses the term "data broker," and it never limits its applicability to websites. See N.J.S.A. 56:8-166.1.

## B. Misrepresentations that Assignors Are "Covered Persons."

DarkOwl claims that Atlas misrepresented that the "tens of thousands of emails it sent to DarkOwl were from 'covered persons' or otherwise constituted valid requests under Daniel's Law." DarkOwl Counterclaims ¶ 74, ¶ 8 (Atlas signed up thousands of "alleged covered persons"), ¶11 (Daniel's Law request devoid of information needed to confirm that requests were "made on behalf of actual Covered Persons"). This bald assertion of misrepresentation does not support a fraud claim because there are no factual allegations demonstrating the representation was actually false. Specifically, DarkOwl does not allege facts that show that even a single nondisclosure request was made by or on behalf of someone that was not a covered person.[44] This is plainly insufficient under Rule 9(b). See e.g., Melone v. Cryoport Inc., No. CV 23-3243 (MAS) (JBD), 2024 WL 1743108, at *10 (D.N.J. Apr. 23, 2024) (dismissing fraud claim because "Plaintiffs simply conclude that Morgan Fertility's statements were fraudulent without any facts to explain why or how"); Hoffman v. Hampshire Labs, Inc., 405 N.J. Super. 105, 115, 963 A.2d 849, 854 (App. Div. 2009) ("[P]laintiff alleged that defendants made material misrepresentations of facts concerning *Herculex;* however, plaintiff failed to plead

---

[44] DarkOwl's allegation that the emails were sent from Atlas and not from the assignors contradicts the detailed factual allegations of Atlas's Complaint, which explained on a step-by-step basis how the emails were sent by the assignors themselves. See DarkOwl Complaint ¶¶ 29, 30, 31, 49, 50.

specific facts that, if proven, would show that defendants' representations were false.").

This theory also fails because DarkOwl does not allege any facts to support scienter. Scienter requires the proving of a "defendant's knowledge of the falsity and intent to obtain an undue advantage." DepoLink Ct. Reporting & Litig. Support Servs. v. Rochman, 430 N.J. Super. 325, 336 (App. Div. 2013). But DarkOwl asserts no facts from which it can be concluded that Atlas had knowledge that any assignor was not a covered person. Counterclaims ¶ 75 (alleging in conclusory fashion that Atlas "knew its representations were false and/or otherwise unverified.").[45] Without such factual allegations, DarkOwl's scienter claims fail. United States, ex rel. Pilecki–Simko v. Chubb Inst., 443 Fed. Appx. 754, 760–761 (3d Cir. 2011) (finding

---

[45]    Even if DarkOwl alleged facts to support its contention that Atlas failed to verify whether the individuals were covered persons (and it does not), a failure to verify does not demonstrate scienter. LS-NJ Port Imperial LLC v. A.O. Smith Water Prods. Co., No. 22CV1687 (EP) (JSA), 2022 WL 17547269, at *8 (D.N.J. Dec. 8, 2022) (dismissing fraud claim for insufficient allegations of "actual knowledge of the falsity of a fact," despite allegation of information that could have put defendant on notice that statements might not be true); Patel v. Zoompass Holdings, Inc., 2019 WL 6912701, at *2 (D.N.J. May 14, 2019) (relying on cases finding scienter requires more than "inexcusable neglect" to reject claims based on failure to check press release against companies 10-Q); Tsereteli v. Residential Asset Securitization Trust 2006–A8, 692 F. Supp. 2d 387, 395 (S.D.N.Y. 2010) (ruling that allegations about a failure to verify are "insufficient to support an inference that the . . . Agencies did not actually believe that the ratings they had assigned were supported by the factors they said they had considered").

insufficient facts to support element of knowledge where the complaint alleged, generally, that "Chubb ... knowingly uses ... false records or statements ...."); <u>see generally</u> <u>In re Suprema Specialties, Inc. Sec. Litig.</u>, 438 F.3d 256, 282 (3d Cir. 2006) ("A pleading of scienter sufficient to satisfy Rule 9(b) 'may not rest on a bare inference that a defendant "must have had" knowledge of the facts' or 'must have known' of the fraud given his or her position in the company."); <u>Johnson v. Draeger Safety Diagnostics, Inc.</u>, 2013 WL 3788937, at *6 (D.N.J. July 19, 2013) (conclusory allegations that defendant "knew that the representations about quality were false" insufficient to meet Rule 8(a) pleading standard).

The claim for fraud based on the representation that individuals are covered persons also fails because DarkOwl has not adequately alleged justifiable reliance. Specifically, DarkOwl does not allege a single action it took in reliance on the representation that individuals are covered persons. <u>See generally</u> DarkOwl Counterclaims. For example, it does not and cannot allege that it removed the data of these individuals in reliance on the data because it has not done so and continues to profit from selling the protected information.

Finally, DarkOwl's fraud claim based on the covered-person representation also fails because it does not identify any damage from this purportedly false representation. DarkOwl Counterclaims ¶ 78 (conclusorily alleging only that

"DarkOwl was, and continues to be, damaged and suffered loss as a result of DarkOwl's reliance on Atlas's misrepresentations").

### C. Misrepresentations based on access to Counterclaim Plaintiffs' data.

DarkOwl also bases its fraud claim on its contention that Atlas must have accessed its platform illegitimately because a screenshot from that platform is in Plaintiffs' Complaint. DarkOwl Counterclaims ¶ 41. DarkOwl alleges that "Atlas could not have accessed DarkOwl's platform and/or data unless Atlas or someone on their behalf misrepresented itself to DarkOwl or to a DarkOwl customer." Id. ¶ 67. But as noted in the discussion of the CROA claim, there are legitimate, non-fraudulent explanations for how Atlas obtained the screenshot and therefore DarkOwl has not plausibly alleged a fraudulent misrepresentation. See supra Section I.A.1.

This theory of fraud also fails because it does not allege justifiable reliance with particularity. DarkOwl does not clearly allege that it relied on the purported misrepresentation – only that "DarkOwl *and/or* DarkOwl's customer(s) reasonably relied upon Atlas's misrepresentations." DarkOwl Counterclaims ¶ 71. But DarkOwl does not have standing to bring a fraud claim on behalf of its customers. See e.g., EP Henry Corp v. Cambridge Pavers, Inc., C.A. No. 17–1538, 2017 WL 4948064, at *5 (D.N.J. Oct. 31, 2017) ("To the extent that [Plaintiff] argues that hypothetical customers relied on Cambridge's alleged misstatements in deciding to

purchase Cambridge products over those of another manufacturer, [Plaintiff] lacks standing to bring suit on their behalf.").  And DarkOwl does not definitively allege any facts that support its claim that it relied on any particular misrepresentation – even though this is information that is uniquely within DarkOwl's own knowledge. Its failure to do so is fatal.  <u>Hoffman</u>, 405 N.J. Super. at 116 (dismissing fraud claim when plaintiff alleged reliance but "failed to plead sufficient facts which would establish that he or any member of the putative class detrimentally relied upon defendants' representations").

Finally, DarkOwl's conclusory allegations that each "was, and continues to be, damaged and suffered loss as a result of [its[] reliance on Atlas's misrepresentations," DarkOwl Counterclaims ¶ 68, are insufficient under both Rule 8 and Rule 9.  <u>See</u> <u>e.g.</u>, <u>supra</u> Section I.B.[46]

---

[46]    US Data also alleges that Atlas misrepresented to it, in January and February 2024, that it was working with US Data to achieve compliance but was really delaying and not acting in good faith.  US Data Counterclaims ¶¶ 89-90.  Such a theory fails because US Data does not explain how it acted in reliance on any such representation. Indeed, US Data alleges that it worked to process the nondisclosure emails without Atlas's assistance.  <u>Id</u>. ¶ 37.  Moreover, US Data acknowledges that it delayed asking Atlas for assistance for a period of 20 days, <u>id.</u> ¶¶ 32-33, more than twice the period allowed by Daniel's Law and a shorter time than it took Atlas to get back to US Data.

## IV.    DarkOwl, Alesco, PCM, SearchBug and US Data Each Fail to Plead a Viable Civil Conspiracy Claim.

The civil conspiracy claims brought by Counterclaim Plaintiffs DarkOwl, Alesco, PCM, SearchBug and US Data fail for two reasons.

First, because, as discussed above, the Counterclaim Plaintiffs' other claims fail, the civil conspiracy claims necessarily also fail.  "A conspiracy is not actionable absent an independent wrong; therefore, the dismissal of [plaintiff's] other causes of action requires dismissal of the conspiracy claim."  Eli Lilly and Co. v. Roussel Corp., 23 F. Supp. 2d 460, 497 (D.N.J. 1998) (dismissing conspiracy claim); Zahl v. New Jersey Dept. of Law and Public Safety, C.A. No. 06–3749, 2010 WL 3810530, at *5 (D.N.J. Sept. 21, 2010) (dismissing civil conspiracy claim where other causes of action were dismissed).

Second, Counterclaim Plaintiffs do not establish the other requisite elements of a civil conspiracy.  "In New Jersey, the essential elements of a civil conspiracy are: (1) combination of two or more persons; (2) a real agreement or confederation with a common design; (3) the existence of an unlawful purpose to be achieved by unlawful means; and (4) special damages."  Eli Lilly & Co., 23 F. Supp. 2d at 496. "In order to survive a Fed.R.Civ.P. 12(b)(6) motion to dismiss, a civil conspiracy claim must allege at least some facts which could, if proven, permit a reasonable inference of a conspiracy to be drawn. Plaintiffs can meet this requirement when their complaint sets forth a valid legal theory and it adequately states the conduct,

time, place, and persons responsible." <u>Wiatt v. Winston & Strawn LLP</u>, 838 F. Supp.

2d 296, 317 (D.N.J. 2012) (cleaned up).  Where allegations regarding the conspiracy

are conclusory, a civil conspiracy claim must be dismissed.  <u>See e.g.</u>, <u>D'Agostino v.</u>

<u>Wilson</u>, 2019 WL 5168621, at *4 (D.N.J. Oct. 11, 2019) (dismissing civil conspiracy

claim where "Plaintiff does not allege facts sufficient to support his conclusions.");

<u>Beauvil v. City of Asbury Park</u>, 2018 WL 2455928, at *5 (D.N.J. June 1, 2018)

(dismissing a civil conspiracy claim that contained only "conclusory allegations").

Here, Counterclaim Plaintiffs' allegations are wholly conclusory.  For

example, DarkOwl says only that "Atlas and/or one or more entities or individuals

jointly, separately, or through someone acting on their behalf, conspired and agreed

to unlawfully access DarkOwl's computers, platform, and/or data and to take, harm,

or otherwise use such unlawfully obtained information."  Counterclaims ¶ 81.  There

are no details about the purported agreement, such as who the agreement was with,

when the agreement was made, or why.  These threadbare allegations are insufficient

to put Atlas on notice of with whom, what or when they purportedly entered into a

conspiracy.  Indeed, the assertion that Atlas agreed with *someone* to access

DarkOwl's computers is contradicted by other allegations, in which DarkOwl

acknowledges that Atlas could have acted alone.  Counterclaims ¶ 67.  Nor, again,

is there any factual support for the contention that DarkOwl was damaged.  The civil

conspiracy charge brings in no other actors beyond Atlas, serves no purpose, and

does not identify any factual support for key elements of the claim.  It should be dismissed.

## CONCLUSION

For the reasons stated above, the Court should dismiss the Counterclaim Plaintiffs' counterclaims in their entirety.  Because Counterclaim Plaintiffs cannot rectify the flaws with their claims given their affirmative factual allegations, the counterclaims should be dismissed with prejudice.[47]

Respectfully submitted,

By: */s Rajiv D. Parikh*

**PEM LAW, LLP**
Rajiv D. Parikh
Kathleen Barnett Einhorn
Jessica A. Merejo
One Boland Dr., Suite 101
West Orange, New Jersey 07052
Telephone: (973) 577-5700
Email: rparikh@pemlawfirm.com
        keinhorn@pemlawfirm.com
        jmerejo@pemlawfirm.com

**BIRD MARELLA RHOW
LINCENBERG DROOKS NESSIM LLP**

---

[47]    The counterclaims asserted against Atlas must also be dismissed because Atlas appears in this action solely in its capacity as an assignee under Daniel's Law. Each of the counterclaims, however, is asserted against Atlas in its individual capacity and is premised on alleged actions that Counterclaim Plaintiffs contend Atlas undertook on its own behalf, rather than as an assignee. Accordingly, Counterclaim Plaintiffs have failed to assert proper counterclaims against Atlas in this action. The appropriate procedural vehicle for the claims asserted is a third-party complaint, not counterclaims.

Ekwan E. Rhow (*pro hac vice forthcoming*)
Elliot C. Harvey Schatmeier (*pro hac vice forthcoming*)
1875 Century Park East, 23rd Fl
Los Angeles, California 90067
Telephone: (310) 201-2100
Email: erhow@birdmarella.com
      ehs@birdmarella.com