# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEW JERSEY

ATLAS DATA PRIVACY CORPORATION, *et al.*,

    *Plaintiffs,*

v.

THE ALESCO GROUP, L.L.C., *et al.*,

    *Defendants.*

Case No.: 1:24-cv-05656-HB

Civil Action

---

# THE ALESCO GROUP, L.L.C.'S OPPOSITION TO PLAINTIFFS' 12(b)(6) MOTION TO DISMISS COUNTERCLAIMS

---

**GREENSPOON MARDER LLP**
Kelly M. Purcaro, Esq.
Kory Ann Ferro, Esq.
One Gateway Center, Suite 2600
Newark, New Jersey 07102
Tel.: (732) 456-8734 or 8746
Kelly.Purcaro@gmlaw.com
KoryAnn.Ferro@gmlaw.com

*Attorneys for Defendant The Alesco Group, L.L.C.*

# **TABLE OF CONTENTS**

**Page**

I.    PRELIMINARY STATEMENT ...................................................................1

II.   FACTUAL BACKGROUND........................................................................2

    A.    The Parties and Businesses Operations...................................................2

    B.    Atlas' Reckless and Purposeful Conduct ...............................................4

          1.    Atlas' Failure to Verify Covered-Person Status, Target Suitability, or Alesco's Practices ................................................4

          2.    Alesco's Existing Opt-Out Platform -Atlas Decision to Ignore It...........................................................................................4

          3.    Bulk Email "Attack," Blocking by Spam Filters, Lack of Receipt.......................................................................................5

          4.    Court-Ordered "Lists," Volume of Requests, and Duplications ...............................................................................5

    C.    Harm to Alesco's Systems, Business, and Operations...........................6

III.   LEGAL STANDARD ..................................................................................7

IV.  LEGAL ARGUMENT.................................................................................8

    A.    Alesco Sufficiently Pled a Claim for Relief under CFAA....................8

          1.    Alesco Sufficiently Pled Atlas Caused Damage/Loss over $5,000...................................................................................13

          2.    Alesco Sufficiently Pled Multiple CFAA Subsections Violated ...............................................................................15

          3.    Atlas Misreads the Law, Mischaracterizes Alesco's Allegations, and Invites Premature Fact-Finding ....................16

    B.    Alesco Sufficiently Pled a Claim for Relief under CROA .................20

          1.    Alesco Adequately Alleges the First CROA Element.............21

          2.    ALESCO Adequately Alleges the Second CROA Element ..............................................................................23

          3.    Atlas is Wrong on the Law and the Facts for CROA ..............24

i

C.  Alesco Sufficiently Pled a Claim for Tortious Interference ...............25

    1.  Reasonable Expectation of Economic Benefit Plausibly Pled...............................................................................26

    2.  Malicious Interference by Atlas is Sufficiently Pled................27

    3.  Resulting Losses is Plausibly Pled..............................................28

D.  Alesco Sufficiently Pled a Claim for Relief for Civil Conspiracy......29

V.  CONCLUSION..............................................................................................31

# TABLE OF AUTHORITIES

## Cases

*Advanced Fluid Sys., Inc. v. Huber*,
  28 F. Supp. 3d 306 (M.D. Pa. 2014), *aff'd, 958* F.3d 168
  (3d Cir. 2020) ........................................................................... 8, 9, 13, 16

*Am. Online, Inc. v. Nat'l Health Care Disc., Inc.*,
  121 F. Supp. 2d 1255 (N.D. Iowa 2000) .................................... 10, 14, 18

*Andritz, Inc. v. S. Maint. Contractor, LLC*,
  No. 3:08-CV-44(CDL), 2009 WL 10674137 (M.D. Ga. Feb. 4, 2009) ................9

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) .................................................................... 7, 8, 18

*Austar Int'l Ltd. v. AustarPharma LLC*,
  425 F. Supp. 3d 336 (D.N.J. 2019) ........................................................28

*Auto. Res. Mgmt. LLC v. Favo*,
  No. CV 21-2630 (SRC), 2022 WL 1080991 (D.N.J. Apr. 11, 2022) .................20

*Avaya Inc., RP v. Telecom Labs, Inc.*,
  838 F.3d 354 (3d Cir. 2016) .......................................................... 25, 27, 28

*B & B Microscopes v. Armogida*,
  532 F. Supp. 2d 744 (W.D. Pa. 2007) ......................................... 9, 12, 14

*Bell Atlantic Corp. v. Twombly*,
  550 U.S. 544 (2007) ...................................................................8, 18

*Brooks v. AM Resorts, LLC*,
  954 F. Supp. 2d 331 (E.D. Pa. 2013) ............................................ 11, 18

*Christie v. Nat'l Inst. for Newman Stud.*,
  No. CV 16-6572 (FLW), 2019 WL 1916204 (D.N.J. Apr. 30, 2019) ................8

*Cline v. Reetz-Laiolo*,
  329 F. Supp. 3d 1000 (N.D. Cal. 2018) ........................................ 11, 18

*Craftmatic Sec. Litig. v. Kraftsow*,
  890 F.2d 628 (3d Cir. 1989) ..............................................................8

*Dello Russo v. Nagel*,
   358 N.J. Super. 254 (App. Div. 2003)...................................................................27

*Ewing v. Cumberland Cnty.*,
   152 F. Supp. 3d 269 (D.N.J. 2015)......................................................................30

*Fairway Dodge, L.L.C. v. Decker Dodge, Inc.*,
   191 N.J. 460 (2007) ...........................................................................................20

*Farmers Ins. Exch. v. Auto Club Grp.*,
   823 F. Supp. 2d 847 (N.D. Ill. 2011)...............................................10, 11, 14, 18

*Farris v. Cnty. of Camden*,
61 F. Supp. 2d 307 (D.N.J. 1999) .........................................................................30

*Ferring Pharms. Inc. v. Watson Pharms., Inc.*,
   No. 2:12-CV-05824 (WJM), 2014 WL 12634303 (D.N.J. Aug. 4, 2014)...........20

*Fidlar Techs. v. LPS Real Est. Data Sols., Inc.*,
   810 F.3d 1075 (7th Cir. 2016) .......................................................................12, 16

*Fineman v. Armstrong World Indus.*,
   980 F.2d 171 (3d Cir. 1992) ..........................................................................25, 26

*Freeman v. Giuliani*,
   No. CV 21-3354 (BAH), 2022 WL 16551323 (D.D.C. Oct. 31, 2022)..............30

*Gaetano v. Gilead Sciences, Inc.*,
   529 F. Supp. 3d 333 (2021) ...........................................................................17, 23

*Great Lakes Rubber Corp. v. Herbert Cooper Co.*,
   286 F.2d 631 (3d Cir. 1961) ...............................................................................19

*Gross v. Coloplast Corp.*,
   434 F. Supp. 3d 245, 249 (E.D. Pa. 2020) ............................................................8

*Hauptmann v. Wilentz*,
   570 F.Supp. 351 (D.N.J. 1983)............................................................................17

*Heartland Payment Sys., LLC v. Carr*,
   No. 318CV09764BRMDEA, 2021 WL 302918 (D.N.J. Jan. 29, 2021).............26

*Hillsborough Rare Coins, LLC v. ADT LLC*,
   No. CV 16-916 (MLC), 2017 WL 1731695 (D.N.J. May 2, 2017) ....................29

*In re Adams Golf, Inc. Securities Litigation*,
  381 F.3d 267 (3d Cir. 2004) .......................................................................... 17, 23

*Industria De Alimentos Zenu S.A.S. v. Latinfood U.S. Corp.*,
  679 F. Supp. 3d 53 (D.N.J. 2023)..........................................................................27

*Lamorte Burns & Co. v. Walters*,
  167 N.J. 285 (2001) ...................................................................... 26, 27, 28, 29

*MaxLite, Inc. v. ATG Elecs., Inc.*,
  193 F. Supp. 3d 371 (D.N.J. 2016)..........................................................................29

*MaxLite, Inc. v. ATG Elecs., Inc.*,
  No. CV 15-01116, 2024 WL 4764685 (D.N.J. Nov. 13, 2024) ..........................30

*Modis, Inc. v. Bardelli*,
  531 F.Supp.2d 314 (D. Conn. 2008) ......................................................................9

*New Jersey Carpenters & the Trs. Thereof v. Tishman Const. Corp of New Jersey*,
  760 F.3d 297 (3d Cir. 2014) ...................................................................................8

*P.C. Yonkers, Inc. v. Celebrations the Party & Seasonal Superstore*,
  428 F.3d 504 (3d Cir. 2005), 2007 WL 708978 (D.N.J. Mar. 5, 2007)................9

*P.C. of Yonkers, Inc. v. Celebrations!*,
  No. 04-4554, 2007 WL 708978 (D.N.J. Mar. 5, 2007) ......................................20

*Philip Morris USA, Inc. v. Lee*,
  481 F. Supp. 2d 742 (W.D. Tex. 2006) ................................................................30

*Phillips v. County of Allegheny*,
  515 F.3d 224 (3d Cir. 2008) ...................................................................................8

*Printing Mart-Morristown v. Sharp Electronics Corp.*,
  116 N.J. 739 (1989) .......................................................................... 25, 26, 27, 29

*Pulte Homes, Inc. v. Laborers' Int'l Union of N. Am.*,
  648 F.3d 295 (6th Cir. 2011) ......................................................... 10, 14, 16, 18

*ResMan, LLC v. Karya Prop. Mgmt., LLC*,
  No. 4:19-CV-00402, 2019 WL 4394564 (E.D. Tex. Sept. 13, 2019)..... 12, 13, 16

*Ryanair DAC v. Booking Holdings Inc.*,
   636 F. Supp. 3d 490 (D. Del. 2022) .................................................... 9, 13, 15, 16

*Ryanair DAC v. Booking Holdings Inc.*,
   No. CV 20-1191-WCB, 2024 WL 3732498 (D. Del. June 17, 2024).......... 12, 16

*Shurgard Storage Centers, Inc. v. Safeguard Self Storage, Inc.*,
   119 F. Supp. 2d 1121 (W.D. Wash. 2000) .................................................... 12, 16

*SMH Enters., L.L.C. v. Krispy Krunchy Foods, L.L.C.*,
   No. CV 20-2970, 2021 WL 1226411 (E.D. La. Apr. 1, 2021) .................... 12, 13

*St. Johns Vein Ctr., Inc. v. StreamlineMD LLC*,
   347 F. Supp. 3d 1047 (M.D. Fla. 2018) ........................................... 11, 12, 14, 18

*Teva Pharms. USA, Inc. v. Sandhu*,
   291 F. Supp. 3d 659 (E.D. Pa. 2018).................................................... 9, 13, 15, 16

*Transamerica Occidental Life Ins. Co. v. Aviation Office of Am., Inc.*,
   292 F.3d 384 (3d Cir. 2002) ....................................................................19

*United States v. Carlson*,
   209 F. App'x 181 (3d Cir. 2006).................................................... 10, 14, 16, 18

*United States v. Drew*,
   27 F. App'x 164 (4th Cir. 2001)............................................................ 11, 14, 18

*United States v. Lowson*,
   No. CRIM. 10-114 KSH, 2010 WL 9552416 (D.N.J. Oct. 12, 2010) .......... 13, 16

*Velop, Inc. v. Kaplan*,
   301 N.J. Super. 32 (App. Div. 1997)....................................................................28

*Victaulic Co. v. Tieman*,
   499 F.3d 227 (3d Cir. 2007) ........................................................................ 17, 23

## **Statutes**

18 U.S.C. § 1030............................................................................... *passim*

N.J.S.A. 2A:38A-1....................................................................................21

N.J.S.A. 2A:38A-2....................................................................................23

N.J.S.A. 2A:38A-3 ................................................................................ 20, 22, 24

**<u>Rules</u>**

Fed. R. Civ. P. 9 .........................................................................................8

Fed. R. Civ. P. 12 ............................................................................. 1, 7, 17

## I.    <u>PRELIMINARY STATEMENT</u>

Atlas Data Privacy Corporation's ("Atlas") motion asks this Court to disregard the well-pleaded facts alleged in Alesco's Counterclaims and to excuse Atlas' deliberate, coordinated, and unlawful campaign that overwhelmed Alesco's systems, disrupted its business, and improperly accessed its protected computer environment. Atlas did not act as a good-faith intermediary assisting "covered persons" under Daniel's Law. Rather, Atlas built a commercial enterprise around manufacturing claims for itself: it recruited thousands of purported assignors, withheld their requests for months until it reached "critical mass," and then launched a barrage of nearly 50,000 auto-generated emails—sent within days, from a single domain, and in multiple duplicative batches designed to trigger spam defenses and frustrate compliance.

Atlas ignored Alesco's existing opt-out platform—capable of instant processing—and instead employed tactics intended to overwhelm Alesco's servers, divert personnel from ongoing client work, and create the appearance of noncompliance in order to monetize assigned claims. Atlas compounded the harm by improperly accessing or attempting to access Alesco's protected systems and data, despite not being an Alesco customer and having no authorization to do so.

These allegations—taken as true at the Rule 12(b)(6) stage—readily satisfy the elements of Alesco's counterclaims under the Computer Fraud and Abuse Act,

the New Jersey Computer Related Offenses Act, tortious interference, and civil conspiracy. Atlas' attempt to reframe this misconduct as merely "ordinary pre-litigation activity" is inconsistent with the detailed factual allegations describing a computer-based attack, unauthorized access, intentional business disruption, and coordinated actions undertaken with the purpose of manufacturing claims.

Because Alesco's Counterclaims more than plausibly state each cause of action, the Court should deny Atlas' motion in its entirety.

## II.    <u>FACTUAL BACKGROUND</u>

### A.    **The Parties and Businesses Operations**

The Alesco Group, L.L.C. ("Alesco") is a small, Florida-based business-to-business ("B2B"] data solutions, marketing, and privacy company headquartered in Fort Myers, Florida, and it provides services via interstate computer services. *See* CC[1] at ¶¶ 1, 40. Alesco does not have offices or locations in New Jersey, does not publish "personal information on the web" nor does it provide a "people search website." *Id.* ¶¶ 1, 19. To become a customer and gain access to Alesco's services, data, and platform, customers must agree to either a Master Services Agreement (for resellers) or Data Use Terms and Conditions Agreement (for end users), complete business verification, and payment in advance. *Id.* ¶41. These agreements contain

---

[1] "CC" refers to Alesco's Counterclaims set forth in its Amended Answer, Affirmative Defenses, Counterclaims, and Demand for Jury Trial (Doc. No. 62).

limitations on permissible use of data, confidentiality requirements, reporting obligations for unauthorized use, indemnification requirements, and limitations on liability. *Id.* ¶42.

Atlas, a Delaware corporation with offices in New Jersey, leveraged recent amendments to Daniel's Law to create a "cottage industry" designed to recruit purported "covered persons," direct them toward a preset list of targets, and profit by asserting assigned claims against numerous businesses. *Id*. ¶¶2, 10–11. Atlas signed up thousands of alleged covered persons ("Assignors"), asked them to assign legal rights to Atlas, provided a preset list of target companies, and generated "nondisclosure requests" on the Assignors' behalf. *Id.* ¶¶11–12. The "nondisclosure requests" Atlas generated were generic, auto-generated emails devoid of individualized information necessary to confirm the requests were bona fide, were made on behalf of actual covered persons, were authorized by Assignors, or that the information at issue constituted protected information under Daniel's Law. *Id.* ¶12. These requests were created and sent by Atlas—not by the Assignors as required by Daniel's Law. *Id.* ¶13. Atlas collected Assignors for approximately six months and withheld sending purported nondisclosure requests until reaching "critical mass" to launch its campaign. *Id.* ¶14. This delay demonstrates Atlas' motive was not safety, because Atlas could have generated opt-out requests immediately upon sign-up rather than waiting months. *Id.*¶15.

3

**B.**     **Atlas' Reckless and Purposeful Conduct**

   1.     *Atlas' Failure to Verify Covered-Person Status, Target Suitability, or Alesco's Practices*

Atlas failed to verify that Assignors qualified as "covered persons" under Daniel's Law. *Id.* ¶16. Atlas failed to verify that targeted companies—including Alesco—possessed or disclosed protected information of the Assignors. *Id.* ¶17. Atlas failed to advise Assignors of Alesco's business, terms of use, privacy practices, or other material facts about Alesco. *Id.* ¶18. Atlas misrepresented that Alesco was a "data broker," that Alesco published personal information on the web, and that Alesco offered a "people search website." *Id.* ¶19.

   2.     *Alesco's Existing Opt-Out Platform -Atlas Decision to Ignore It*

Alesco had a preexisting opt-out process available on its website that could have processed opt-out requests regardless of whether an individual was a covered person under Daniel's Law. *Id.* ¶21. Atlas ignored this user-friendly opt-out platform and instead sent tens of thousands of emails from "@atlasmail.com" to "info@alescodata.com," as a targeted bulk-email campaign. *Id.* ¶20. Atlas decision to ignore the opt-out platform supports an inference that Atlas intended to create noncompliance and manufacture claims rather than obtain prompt removal of information. *Id.* ¶¶21, 39.

3.    *Bulk Email "Attack," Blocking by Spam Filters, Lack of Receipt*

Atlas's campaign triggered Alesco's spam filters, which automatically blocked the bulk emails as a suspicious simultaneous flood from a single sender. *Id.* ¶26. Alesco it did not become aware of any alleged nondisclosure requests until it was served with Plaintiffs' complaint in April 2025. *Id.* ¶27. Atlas, not the Assignors sent, the nondisclosure requests, which were not valid and not from qualified covered persons. *Id.* ¶¶23–25.

4.    *Court-Ordered "Lists," Volume of Requests, and Duplications*

Following court orders, Atlas produced "Lists" of alleged nondisclosure request emails, which were the first time Alesco could review details of the purported takedown requests after litigation was underway. *Id.* ¶¶28–29. The Lists show Atlas sent tens of thousands of nearly identical emails for the purpose of frustrating the ten-day compliance period under Daniel's Law. *Id.* ¶30. Atlas generated multiple emails for the same Assignor—sometimes up to five—based on separate categories of information (e.g., address, phone number, alternate phone numbers), which increased volume and created multiple claims per Assignor. *Id.* ¶31. Atlas produced a first List of 49,106 alleged nondisclosure-request emails, and a subsequent Lists of 47,479 alleged nondisclosure-request emails with purported delivery dates and "categories" of covered persons. *Id.* ¶¶32–33. Atlas' 47,000–49,000 separate emails "sent" for about 19,000 Assignors, with duplicates and

5

multiple entries per Assignor for different addresses/phone numbers – were purposeful and recklessly inflated to trigger spam blockers and frustrate compliance. *Id.* ¶34. Atlas falsely claims that the individual Assignors simultaneous began to send these emails at a rate of approximately 7,000 emails per day for several consecutive days in January 2024. *Id.* ¶35.

The unsolicited post-New Year's massive, coordinated, and artificially inflated email attack was not authorized communications. *Id.* ¶¶ 36, 39, 48. In addition, neither Atlas nor the individually named plaintiffs are Alesco customers and therefore were not authorized to access Alesco's computer systems, platform, or data – yet Atlas claims to have accessed same. *Id.* ¶44-45. Atlas' only way to access Alesco data would be by hacking, fraudulent creation of a fake account, or unauthorized access through a third party posing as an Alesco customer. *Id.* ¶46. Atlas' unauthorized access was accomplished through improper means and a plan with at least one unknown actor to purposefully harm Alesco. *Id.* ¶¶47–48.

## C.    Harm to Alesco's Systems, Business, and Operations

Atlas' campaign flooded its systems and servers and was designed as a computer-based attack to manufacture claims and profits for Atlas. *Id.* ¶¶36, 40. Even when Ordered to provide the requests so Alesco could attempt to retrieve or otherwise review the purported requests, Atlas made the Lists unmanageable—non-searchable, non-editable, containing multiple line items per Assignor, and difficult

to import—further frustrating compliance efforts. *Id.* ¶37. Alesco had to devote substantial time and limited resources to processing the Lists, diverting employees from legitimate client services and business inquiries. *Id.* ¶38. Atlas could have used Alesco's opt-out platform—which would have automatically processed takedown requests—yet chose tactics that prevented compliance, supporting Alesco's inference of intent to manufacture claims. *Id.* ¶39.

Atlas' unauthorized access to Alesco's computer systems and data, including the massive volume of emails (whether blocked by spam filters or partially received or received through the Lists) caused significant damage and harm to Alesco, for example, by creating a 91% duplication rate making processing impossible, diverting significant resources and staff time from legitimate customers review required for thousands of requests, completely overwhelming this small company's systems and resources and consuming substantial employee time on processing the sheer volume, duplication, and impossibility of efficient compliance created by Atlas. *Id.* ¶49. Atlas' actions caused "significant damage and harm" including overwhelming Alesco's systems and resources, consuming substantial employee time, and damaging Alesco's business and email/computer systems. *Id.* ¶¶49–50.

## III.  <u>LEGAL STANDARD</u>

On a Rule 12(b)(6) motion, the Court accepts well-pled facts as true and draws reasonable inferences in the non-movant's favor. *Ashcroft v. Iqbal*, 556 U.S. 662,

678 (2009); *New Jersey Carpenters & the Trs. Thereof v. Tishman Const. Corp of New Jersey*, 760 F.3d 297, 302 (3d Cir. 2014). Pleadings survive if they state a claim that is plausible and contain facts to "suggest the required elements" or "raise a reasonable expectation that discovery will reveal evidence" supporting the elements. *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 55 (2007); *Phillips v. County of Allegheny*, 515 F.3d 224, 234 (3d Cir. 2008). Courts do not weigh evidence or demand proof at this stage. *Iqbal*, 556 U.S. at 678; *Twombly*, 550 U.S. at 570.

Fraud claims must satisfy *Fed. R. Civ. P.* 9(b) by pleading the who, what, when, where, and how, but courts apply the rule with practicality, permitting allegations based on information uniquely in the other party's possession to be pled on belief. *Gross v. Coloplast Corp.*, 434 F. Supp. 3d 245, 249 (E.D. Pa. 2020); *Craftmatic Sec. Litig. v. Kraftsow*, 890 F.2d 628, 645 (3d Cir. 1989).

## IV.  LEGAL ARGUMENT

### A.  Alesco Sufficiently Pled a Claim for Relief under CFAA

The Federal Computer Fraud and Abuse Act ("CFAA") 18 U.S.C.A. § 1030 claim requires "(1) damage or loss [] during any 1-year period . . . aggregating at least $5,000 in value; (2) caused by; (3) violation of one of the substantive provisions of §§ 1030(a) or (b)." *Advanced Fluid Sys., Inc. v. Huber*, 28 F. Supp. 3d 306, 326 (M.D. Pa. 2014), *aff'd*, 958 F.3d 168 (3d Cir. 2020) (internal quotes/cites omitted) (alteration in original); *see* 18 U.S.C. § 1030(g); *Christie v. Nat'l Inst. for Newman*

*Stud.*, No. CV 16-6572 (FLW), 2019 WL 1916204, at *4 (D.N.J. Apr. 30, 2019).

"The CFAA prohibits seven types of computer crimes involving unauthorized access to computers (or access in excess of authorization) which results in obtaining information from or damaging the computer." *Huber*, 28 F. Supp. 3d at 326. Relevant here, the CFAA precludes:[2]

> (1) Intentional access to a computer without authorization or exceeding authorized access,[3] and thereby obtains "information from a protected computer."[4] 18 U.S.C. § 1030(a)(2)(C).

> (2) Access to a protected computer or exceeding authorized access "knowingly and with intent to defraud," and "by means of such conduct further[ing] the intended fraud and obtain[ing] anything of value, unless the object of the fraud and the thing obtained consists only of the use of the computer and the value of such use is not more than $5,000 in any 1-year period." *Id.* at (a)(4).

---

[2] Civil actions under CFAA are not limited to violations of subsection (a)(5). *See P.C. Yonkers, Inc. v. Celebrations the Party & Seasonal Superstore*, 428 F.3d 504, 511 (3d Cir. 2005); *Andritz, Inc. v. S. Maint. Contractor, LLC*, No. 3:08-CV-44(CDL), 2009 WL 10674137, at *4 (M.D. Ga. Feb. 4, 2009).

[3] "Exceeds authorized access" means authorized access used "to obtain or alter information in the computer [to which] the accesser is not entitled[.]" 18 U.S.C.§ 1030(e)(6). "[T]he statute imposes liability on one who acts beyond the scope of her access authority." *Teva Pharms. USA, Inc. v. Sandhu*, 291 F. Supp. 3d 659, 668 (E.D. Pa. 2018). Where a username and password are required to access a website, access obtained in violation of the terms of service exceeds authorization. *Ryanair DAC v. Booking Holdings Inc.*, 636 F. Supp. 3d 490, 509 (D. Del. 2022).

[4] A "protected computer" is "used in or affect[s] interstate or foreign commerce or communication[.]" 18 U.S.C. § 1030(e)(2)(B). "A computer is 'protected' if it is connected to the Internet." *Teva Pharms.*, 291 F. Supp. 3d at 668; *see also B & B Microscopes v. Armogida*, 532 F. Supp. 2d 744, 757 (W.D. Pa. 2007); *Modis, Inc. v. Bardelli*, 531 F.Supp.2d 314 (D. Conn. 2008). ALESCO's computers qualify.

(3)    "[K]nowingly caus[ing] the transmission of a program, information, code, or command, and as a result of such conduct, intentionally caus[ing] damage without authorization, to a protected computer." *Id.* at (a)(5)(A).

"[A] plaintiff must show *either* damage or loss." *Farmers Ins. Exch. v. Auto Club Grp.*, 823 F. Supp. 2d 847, 852 (N.D. Ill. 2011) (internal quotes/cites omitted) (emphasis in original); *see also* 18 U.S.C. § 1030(g). "Damage" is "any impairment to the integrity or availability of data, a program, a system, or information." 18 U.S.C. § 1030(e)(8).  A "barrage of calls and e-mails," which "diminish[ a party's] ability to use its systems and data because they prevented [the party] from receiving at least some calls and accessing or sending at least some e-mails" constitutes damage under a transmission claim.  *Pulte Homes, Inc. v. Laborers' Int'l Union of N. Am.*, 648 F.3d 295, 301 (6th Cir. 2011). Such "diminished-ability concept" has been endorsed by numerous courts.  *See id.* at 302; *Am. Online, Inc. v. Nat'l Health Care Disc., Inc.,* 121 F. Supp. 2d 1255, 1274 (N.D. Iowa 2000) ("[W]hen a large volume of [unsolicited bulk e-mail] causes slowdowns or diminishes the capacity of [the party] to serve its customers, an 'impairment' has occurred to the 'availability' of [the party's] 'system.'").  Indeed, in *United States v. Carlson*, 209 F. App'x 181 (3d Cir. 2006), the defendant was convicted for "sending thousands of e-mails to one e-mail address, which would clog the address" and thereby caused damage. *See also*

10

*United States v. Drew*, 27 F. App'x 164, 164 (4th Cir. 2001) (CFAA "clearly criminalizes [] bombarding [] with massive numbers of e-mail messages.").

"Loss" means "any reasonable cost to any victim, including the cost of responding to an offense, conducting a damage assessment, and restoring the data, program, system, or information to its condition prior to the offense, and any revenue lost, cost incurred, or other consequential damages incurred because of interruption of service." 18 U.S.C. § 1030(e)(11). A party "can satisfy the CFAA's definition of loss by alleging costs reasonably incurred in responding to an alleged CFAA offense, even if the alleged offense ultimately is found to have caused no damage as defined by the CFAA." *Farmers Ins.*, 823 F. Supp. 2d at 854; *see also Brooks v. AM Resorts, LLC*, 954 F. Supp. 2d 331, 338 (E.D. Pa. 2013) (Loss includes "the cost of remedial measures taken to investigate or repair the damage to the computer" or "lost revenue resulting from a plaintiff's inability to utilize the computer while it was inoperable because of a defendant's misfeasance."); *Cline v. Reetz-Laiolo*, 329 F. Supp. 3d 1000, 1049 (N.D. Cal. 2018) ("The cost of investigating unauthorized access and securing a computer network constitutes a 'loss' under the statute."). Losses asserted by the claiming party need not be robust to survive dismissal. *See St. Johns Vein Ctr., Inc. v. StreamlineMD LLC*, 347 F. Supp. 3d 1047, 1062 (M.D. Fla. 2018) (denying dismissal where plaintiff alleged "lost time and effort needed to take subsequent remedial measures" to prevent future breaches, "other expenses"

responding to the unauthorized access and "assessing the scope of intrusion," disruption in the day-to-day operations, and devotion of "substantial resources to managing its" data). *St. Johns Vein Ctr.* string cites nine cases wherein allegations from identifying, investigating, or ascertaining the extent of unauthorized access, resecuring servers, or conducting damage assessments were all sufficient to withstand dismissal. *Id.*; *see also B & B Microscopes*, 532 F. Supp. 2d at 758 (damage assessment and lost revenue due to service interruption sufficient).

There are two main differences between 18 U.S.C. § 1030(a)(2) and (a)(4) – first, "subsection (a)(4), unlike (a)(2), requires that a person act with the '*specific intent to defraud*'" and second, "a person violates subsection (a)(2) by merely obtaining '*information*,' while (a)(4) requires that the person obtain '*anything of value.*'" *SMH Enters., L.L.C. v. Krispy Krunchy Foods, L.L.C.*, No. CV 20-2970, 2021 WL 1226411, at *4 (E.D. La. Apr. 1, 2021) (internal cites omitted) (emphasis in original). Fraud under CFAA means "'simply . . . wrongdoing' and does not require 'proof of the common law elements of fraud.'" *Id.* at *5 (quoting *Shurgard Storage Centers, Inc. v. Safeguard Self Storage, Inc.*, 119 F. Supp. 2d 1121, 1126 (W.D. Wash. 2000)) (alteration in original). Defraud means "'wronging one in his property rights by dishonest methods or schemes.'" *Id.* (quoting *Shurgard Storage Centers*, 119 F. Supp. 2d at 1126); *see also Ryanair*, No. CV 20-1191-WCB, 2024 WL 3732498, at *21 (Courts look for "evidence of deceit."); *Fidlar Techs. v. LPS*

*Real Est. Data Sols., Inc.*, 810 F.3d 1075, 1079 (7th Cir. 2016) (defraud means intent to deceive or cheat). "[C]ourts have found that a plaintiff states a claim under § 1030(a)(4) when it alleges that the defendant participated in dishonest methods to obtain the plaintiff's secret information." *SMH Enters*, No. CV 20-2970, 2021 WL 1226411 at *6 (internal quotes omitted); *see also United States v. Lowson*, No. CRIM. 10-114 KSH, 2010 WL 9552416, at *7-8 (D.N.J. Oct. 12, 2010) (finding intent to defraud properly pled where defendant accessed site in contravention of terms of service); *ResMan, LLC v. Karya Prop. Mgmt., LLC*, No. 4:19-CV-00402, 2019 WL 4394564, at *3 (E.D. Tex. Sept. 13, 2019) (plaintiff sufficiently pled defendant provided database access to third party in violation of terms of service).

A "person who did not directly access the computer may still be liable under the CFAA if he 'directs, encourages, or induces' someone else to access a computer that he himself is unauthorized to access." *Teva Pharms.*, 291 F. Supp. 3d at 671 (cite omitted); *see also Huber*, 28 F. Supp. 3d at 328 (sufficient allegations of conspiracy to gain access); *Ryanair*, 636 F. Supp. 3d at 499.

    1.    *Alesco Sufficiently Pled Atlas Caused Damage/Loss over $5,000*

Damage under 18 U.S.C. § 1030(e)(8) includes any impairment to the availability of a system. Alesco alleges Atlas orchestrated a post holiday-timed surge of ~48,000 auto-generated emails spam attack upon Alesco's website, serve and/or database, which constituted impaired availability through forced communications

13

interruptions and overwhelmed systems – i.e., the precise "impairment of availability" multiple courts recognize as "damage." *See Pulte Homes*, 648 F.3d at 301-02 (mass calls/emails diminished ability to use systems); *Am. Online*, 121 F. Supp. 2d at 1274 (bulk email causing slowdowns impairs "availability"); *Carlson*, 209 F. App'x 181 (thousands of emails clogging address constitutes damage); *Drew*, 27 F. App'x at 164 (bombardment with e-mail messages creates damage).

Loss includes reasonable costs to respond, investigate and restore systems, and consequential damages from service interruption. 18 U.S.C. § 1030(e)(11). Alesco pleads loss through such costs in response, investigation and consequential damages resulting from the massive volume of emails (whether blocked by spam filters or partially received or received through the Lists), e.g. Atlas' created 91% duplication rate made processing requests impossible, forced diversion of significant resources and staff time from legitimate customers to sort through duplicates, necessitating exorbitant resources and time for the manual review required for tens of thousands of requests, completely overwhelming this small company's systems and resources and consuming substantial employee time on processing the sheer volume, duplication, and impossibility of efficient compliance. Courts hold that employee time, investigation, mitigation, and restoration costs suffice at the pleading stage. *See Farmers Ins.*, 823 F. Supp. at 852-54; *St. Johns Vein Ctr.*, 347 F. Supp. 3d at 1062; *B & B Microscopes*, 532 F. Supp. 2d at 758.

As such, Alesco plausibly alleges "damage" (capacity impairment) and "loss" (response and restoration costs) far exceeding the $5,000 threshold in one year.

2.    *Alesco Sufficiently Pled Multiple CFAA Subsections Violated*

Only one violation is required to state a CFAA claim, yet Alesco pled multiple subsections violations and with the required plausibility. First, Alesco sufficiently pled violations of § 1030(a)(2)(C): Unauthorized Access to Obtain Information. Atlas – not a customer and barred by Alesco's terms of use, agreements, and privacy practices from automated/disruptive access – intentionally accessed Alesco's protected computers by funneling ~48,000 auto-generated emails into an internal business account and, through that access, obtained information (including system behavior, delivery telemetry, and leverage for manufactured claims). "[O]btaining information" is construed broadly. *See Ryanair,* 636 F. Supp. 3d at 509 (terms-of-use-violative access sufficient); *Teva Pharms.*, 291 F. Supp. 3d at 668 (exceeding access scope sufficient).

Next, Alesco pled a violation of § 1030(a)(4): Unauthorized Access with Intent to Defraud and Obtain Value.  Alesco alleges a deceit-driven scheme: mislabeling Alesco as a "data broker" whom provides "people search" services on the web, misrepresenting covered-person status and requests validity, withholding requests to obstruct compliance, duplicating/inflating volume, and engineering a "critical mass" launched right after the holiday at this small B2B company to extract

15

high statutory-damage value, thus defrauding. "Defraud" means dishonest methods/schemes; "value" is broadly interpreted. *See Shurgard*, 119 F. Supp. 2d at 1126; *Fidlar Techs.*, 810 F.3d at 1079; *Lowson*, 2010 WL 9552416, at *7-8; *ResMan*, 2019 WL 4394564, at *3; *Ryanair*, 2024 WL 3732498, at *21.

Further, Alesco pled facts for violations of § 1030(a)(5)(A): Knowing Transmission Causing Damage. Atlas knowingly transmitted ~48,000 emails rather than use the pre-existing opt-out platform which would have automatically processed all takedown requests immediately, and Atlas did so with the intent to overwhelm Alesco's systems, which caused system impairment (blocked/disabled communications). Mass digital bombardment is actionable. *See Pulte Homes*, 648 F.3d at 301-02; *Carlson*, 209 F. App'x 181.

Finally, Alesco pled violations of § 1030(b): Conspiracy/Attempt to Gain Access. Atlas coordinated with others, recruited tens of thousands of Assignors, auto-generated duplicative requests, used unauthorized means to access, and took overt acts to execute the plan – adequate for conspiracy under this section. *See Teva Pharms.*, 291 F. Supp. 3d at 671; *Huber*, 28 F. Supp. 3d at 328; *Ryanair*, 636 F. Supp. 3d at 499.

      3.    *Atlas Misreads the Law, Mischaracterizes Alesco's Allegations, and Invites Premature Fact-Finding*

Atlas disingenuously claims, in defense of its actions, that bulk spam emails were "ordinary pre-litigation conduct," that Alesco "damage" is conclusory, that

costs are not cognizable "loss," and that alternative, benign explanations defeat plausibility. Each defense fails. The question at this stage is plausibility of pleadings, not possible defenses to same. Defenses cannot justify dismissal. The Third Circuit has clearly stated that "an affirmative defense may not be used to dismiss a [] complaint." *In re Adams Golf, Inc. Securities Litigation*, 381 F.3d 267, 277 (3d Cir. 2004). This rule reflects the fundamental principle that courts "will not rely on an affirmative defense . . . to trigger dismissal of a complaint under Rule 12(b)(6)." *Victaulic Co. v. Tieman*, 499 F.3d 227, 234 (3d Cir. 2007). The rationale is straightforward: on a motion to dismiss for failure to state a claim, "all the well-pleaded material factual allegations of the complaint are to be taken as true, and the complaint is to be read in the light most favorable to plaintiff." *Hauptmann v. Wilentz*, 570 F.Supp. 351, 364 (D.N.J. 1983). Because affirmative defenses "generally depend on extrinsic facts," courts must "tread warily, dismissing under Rule 12(b)(6) only when the plaintiff has effectively pled itself out of court." *Gaetano v. Gilead Sciences, Inc.*, 529 F. Supp. 3d 333, 348 (D.N.J. 2021). Each of Atlas' defenses are inapplicable here.

*"Ordinary pre-litigation communications" Defense:* Atlas recasts a 48,000-email surge sent to a small B2B company's informational inbox rather than through proper, preexisting channels shortly after the New Year holiday with duplications, mismatched entries, and obstruction of validation as normal

17

communications. Alesco alleges the opposite: the timing, scale, duplication, and misdirection were engineered to impair Alesco's systems and manufacture claims— the very conduct courts have condemned as "email bombardment" under CFAA. *See Pulte Homes*, 648 F.3d at 301; *Am. Online,* 121 F. Supp. 2d  1274; *Carlson*, 209 F. App'x 181; *Drew*, 27 F. App'x at 164. ALESCO's normal email traffic increasing from 40 a day, to nearly 10,000 a day, is far from "ordinary" communications.

*"No 'damage'; no 'loss' ≥ $5,000" Defense*: Atlas argues Alesco's damage/loss are conclusory. Not so. Alesco pled concrete system-availability impairment (blocked/disabled email inbox) and response costs (diverted employee time, restoration/mitigation, business interruption) that courts repeatedly recognize as "damage" and "loss" under § 1030(e)(8), (e)(11). *See id.; Farmers Ins.*, 823 F. Supp. 2d at 854; *Brooks v*, 954 F. Supp. 2d at 338; *Cline*, 329 F. Supp. 3d at 1049 *St. Johns*, 347 F. Supp. 3d at 1062. No forensic bill of particulars is required.

*"Alternative explanations defeat plausibility" Defense:* Atlas speculates there are benign explanations (e.g., volume reflected real senders; emails couldn't harm a sophisticated company; any access was permitted). *Iqbal/Twombly* do not require disproval of alternative hypothesis. Alesco need only plead a plausible one – here, a detailed narrative with dates, volumes, system impacts, and Atlas obstructive acts. Competing explanations are classic fact disputes, not dismissal grounds.

*"Assignee status" Defense:* Atlas disingenuously suggests its appearance "as assignee"[5] immunizes it from tort liability for its own conduct (recruitment, auto-generation, timing, duplication, inbox targeting, obstruction). Assignee status does not bar counterclaims for Atlas' independent torts and Atlas cites no authority to the contrary. Atlas' assignee argument deserves short shrift.

*CROA ≈ CFAA Defense*: Atlas argues the New Jersey CROA claims fail and, *ipso facto*, the federal CFAA claims fail. Not true and not here. The statutes are different. For example, unlike CROA, CFAA expressly defines "damage" and "loss" to include system-availability impairment and incident-response costs and provides a private civil remedy with a $5,000 loss threshold that Alesco has plausibly pled.

Alesco satisfied the plausibility bar. Mass, intentional transmissions to a non-privacy email inbox rather than utilizing the pre-existing opt-out pltaform; duplications; obstruction of validation; unauthorized access and knowing transmission causing damage evince liability under the CFAA. Impairment of the availability of core systems (blocked communications; disabled business operations) created damage. Necessity employee hours, mitigation, and business interruption caused loss well over $5,000. Atlas engaged in a deception-based scheme to

---

[5] Atlas filed suit and took actions giving rise to counterclaims. Rule 13 allows counterclaims. *See Transamerica Occidental Life Ins. Co. v. Aviation Office of Am., Inc.*, 292 F.3d 384, 389 (3d. Cir. 2002) (counterclaims proper where there is "a logical relationship" to conduct; "logical relationship has been viewed liberally[]"); *Great Lakes Rubber Corp. v. Herbert Cooper Co.*, 286 F.2d 631, 634 (3d Cir. 1961).

manufacture litigation value with the intent to defraud and obtain value. Atlas coordinated execution with others and automated tools shows conspiracy. Alesco pled detailed, non-conclusory facts that, taken as true, state claims under 18 U.S.C. §§ 1030(a)(2)(C), (a)(4), (a)(5)(A), and (b).

### B.    Alesco Sufficiently Pled a Claim for Relief under CROA

To state a claim under New Jersey Computer Related Offenses Act ("CROA"), *N.J.S.A.* 2A:38A-3, a party must allege: (1) at least one of the statute's purposeful or knowing unauthorized acts, and (2) resulting damage to business or property. *Id.* at (a)-(e); *Fairway Dodge, L.L.C. v. Decker Dodge, Inc.*, 191 N.J. 460, 468 (2007); *P.C. of Yonkers, Inc. v. Celebrations!*, No. 04-4554, 2007 WL 708978, at *8 (D.N.J. Mar. 5, 2007).  *N.J.S.A.* 2A:38A-3[6] states:

> A person or enterprise damaged in business or property as a result of ***any of the following actions*** may sue . . . :
>
> a. The purposeful or knowing, and unauthorized altering, damaging, taking ***or*** destruction of any data, database, computer program, computer software ***or*** computer equipment . . . ;
>
> b. The purposeful or knowing, and unauthorized altering, damaging, taking ***or*** destroying of a computer, computer system or computer network;

---

[6] Atlas narrowing CROA to "anti-hacking" is incorrect. CROA prohibits actions enumerated five subsections. *See Ferring Pharms. Inc. v. Watson Pharms., Inc.*, No. 2:12-CV-05824 (WJM), 2014 WL 12634303, at *6 (D.N.J. Aug. 4, 2014) (denying dismissal where defendant accessed a restricted webcast by evading password); *Auto. Res. Mgmt. LLC v. Favo*, No. CV 21-2630 (SRC), 2022 WL 1080991, at *3 (D.N.J. Apr. 11, 2022)(CROA prohibited accessing work email post-termination).

c. The purposeful or knowing, and unauthorized ***accessing or attempt to access*** any computer, computer system or computer network;

d. The purposeful or knowing, and unauthorized altering, accessing, . . . a financial instrument; ***or***

e. The purposeful or knowing accessing and ***reckless*** altering, damaging, destroying ***or*** obtaining of any data, data base, computer, computer program, computer software, computer equipment, computer system or computer network.

[(emphasis added).]

1.    *Alesco Adequately Alleges the First CROA Element*

Atlas acted "purposefully or knowingly" and without authorization and/or recklessly, violating CROA § (a)-(c) and (e). Under CROA, "access" includes "instruct[ing], ***communicat[ing] with***, stor[ing] data in, retriev[ing] data from, or otherwise us[ing] any resources of a computer, computer system, or computer network." *N.J.S.A.* 2A:38A-1(a) (emphasis added). Courts recognize "access" includes *communication-based* intrusions. *Atlas Data Corp. v. REIPRO, LLC*, Dkt. No. MRS-L-231-24 (Feb. 21, 2025) (Purcaro Cert., **Exhibit A**).

Atlas engaged in unauthorized communication with Alesco's systems by transmitting nearly 48,000 auto-generated spam emails to the wrong inbox, purposefully, knowingly, and recklessly sidestepping Alesco's preexisting out-opt procedure which would have immediately and automatically processed all takedown

requests – regardless of Cover Person Status. Alesco's system recognized this as a security threat and reacted. Such massive spam attack is exactly the type of access intrusion CROA prohibits under §§ 2A:38A-3(a), (b), (c), and (e).

Atlas deliberately flooded Alesco's computers after spending months collecting ~20,000 Assignors and withholding their purported "requests" until Atlas aggregated a critical mass for its attack. Atlas transmitted ~48,000 auto-generated emails to Alesco, at a rate of about ~7,000 per day. Multiple emails per Assignor with various combinations of addresses and numbers were designed to artificially inflate email volume. Atlas sent these emails to Alesco's email inbox, not to Alesco's established opt-out pathways. Alesco plainly describes "purposeful or knowing unauthorized" and/or "reckless" accessing, taking, altering, or damaging. The attack was timed and designed to damage Alesco's systems.

Atlas gained or attempted to gain access by unauthorized or fraudulent means. Atlas is not a customer and has no authorization to access Alesco's system. Atlas accessed Alesco's platform or data by fraudulent means and in violation of Alesco's business practices, contracts, and terms required for use (i.e., hacking and/or using an unauthorized third-party account). Atlas improperly accessing Alesco's systems

by circumventing Alesco's required terms for same is sufficient to satisfy pleading requirements here, particularly when accepted as true.[7]

### 2. *ALESCO Adequately Alleges the Second CROA Element*

ALESCO sufficiently pleads damage to its business and property. CROA expressly recognizes that "property or services, including the use of computer time" are compensable and that value is measured by fair market value or the cost of generating, obtaining, or storing data. *N.J.S.A.* § 2A:38A-2.

Atlas' attack directly disrupted Alesco's business operations, overwhelmed Alesco's email and sytems, and caused "disruption of use" as a result. These allegations are sufficient to plead damages. Alesco was forced to address the cyberattack and divert resources to handle and respond to the deluge, and take action to prevent further harm.[8] Such allegations go beyond minimal pleading threshold.

Nearly identical conduct by Atlas, i.e., allegations of a mass-email cyberattack, has been held sufficient to plead business damage. Indeed, it was foreseeable that sending tens of thousands of emails in a compressed timeframe could disable a system, impede operations, and disrupt a company's ability to serve

---

[7] Fact-intensive disputes cannot be resolved on a 12(b)(6) motion. *In re Adams Golf*, 381 F.3d at 277; *Victaulic Co.*, 499 F.3d at 234; *Gaetano*, 529 F. Supp. 3d at 348.

[8] Alesco incurred substantial business disruption, interference, and measurable damages as a result. The attack consumed significant employee time, resources, and revenue; suffered business interruption; and lost the ability to respond to customers. All cognizable.

customers – satisfying § 2A:38A-3(e). *Atlas Data Corp. v. REIPRO, LLC*, Order at 21. The same logic applies here. Atlas overwhelmed Alesco system, triggered security measures, and diverted resources – clear, cognizable CROA business damage.

### 3.    *Atlas is Wrong on the Law and the Facts for CROA*

Atlas ignores Alesco's detailed facts much like it ignored Alesco's existing opt-out platform. Indeed, Atlas does not even address the facts Alesco alleges nor its counterclaims – rather delegates a few dismissive footnotes to Alesco in a motion to dismiss counterclaims asserted by a different defendant. To be sure, Atlas' footnote claiming that targeting defunct or otherwise improper email is irrelevant because it is not required to send more than written notice is also wrong – Daniel's Law required "receipt" of written notice. Purposefully and recklessly sending spam emails that most likely will not be, and here were not, received is both a problem under Daniel's Law and a violation of CROA. Despite Atlas' willful blindness, Alesco pleads specific, non-conclusory facts showing intentional, unauthorized access and resulting in business harm as detailed above.

Atlas claims that allegations of its purposeful and knowing conduct are "mere conclusions" and that no damage or taking is alleged, misstating the pleading requirements under Rule 8, the requirements under CROA's five sections and ignoring that "access" is established through communications as pled. At pleading,

Alesco is afforded all reasonable inferences – here that its conduct was knowing, purposeful and reckless in avoid proper opt-out channels and instead crafting a profit driving spam attack scheme to enrich itself off Daniel's Law. Atlas mistakenly imposes a damage-to-computer measure here, when same is not required under CROA as detailed above, and further ignores the business damage pled by Alesco. Further, as previously described, Atlas' suggestion that the emails were "ordinary" is contradicted the facts pled. Atlas' claim that no facts show it knew harm was likely similarly ignores the deliberate scheme alleged in detail and obvious inferences required in Alesco's favor.

In sum, Atlas' motion fails here because Alesco pled particularized facts showing purposeful, unauthorized, reckless conduct prohibited under CROA.

### C.    Alesco Sufficiently Pled a Claim for Tortious Interference

The elements for tortious interference are: (1) reasonable expectation of economic benefit or a contract; (2) lost due to malicious interference, and (3) damages as a result. *Avaya Inc., RP v. Telecom Labs, Inc.*, 838 F.3d 354, 382 (3d Cir. 2016); *Printing Mart-Morristown v. Sharp Electronics Corp.*, 116 N.J. 739, 750–52 (1989); *Fineman v. Armstrong World Indus.*, 980 F.2d 171, 186 (3d Cir. 1992). ALESCO sufficiently alleged facts in support of each element of this claim.

1.    *Reasonable Expectation of Economic Benefit Plausibly Pled*

"An action for tortious interference with a prospective business relation protects the right to pursue one's business, calling, or occupation, free from undue influence or molestation. Not only does the law protect a party's interest in a contract already made, but it also protects a party's interest in reasonable expectations of economic advantage." *Lamorte Burns & Co. v. Walters*, 167 N.J. 285, 305 (2001) (internal cites/quotes omitted). A protectable right must be pled, but identification of specific customers lost is not required at the pleading stage.  *Id.*; *see also Heartland Payment Sys., LLC v. Carr*, No. 318CV09764BRMDEA, 2021 WL 302918, at \*7 (D.N.J. Jan. 29, 2021) ("[P]laintiff does not need to allege specific prospective customers or contracts to show a reasonable expectation of prospective economic benefit.") (internal quotes omitted). A party need only allege enough facts to show a protective right (a prospective economic or contractual relationship) giving rise to some "reasonable expectation of economic advantage." *Printing Mart.*, 116. N.J. at 751. Prospective economic relationship is defined broadly, including "even the voluntary conferring of commercial benefits in recognition of a moral obligation" or "any other relations leading to potentially profitable contracts." *Fineman*, 980 F.2d at 195 (internal quotes/cites); *see also Printing Mart*, 116 N.J. at 751-753 (reasonable expectation in ongoing and expected sales to the public). Alesco is a small B2B company that has contracts with and does business with its

clients, which relationships are governed by the appropriate agreement: either the Master Services Agreement ("MSA") which is used for resellers of Alesco's data and make multiple purchases, or the Data Use Terms and Conditions Agreement ("DUTCA") which is used for end users or one-time purchases. It had a reasonable expectation of continuing its relationships and business with current and perspective customers. Alesco sufficiently pled its "right to [its] business, calling, or occupation, free from undue influence or molestation" as required for this element. *Lamorte Burns*, 167 N.J. at 305*; Printing Mart*, 116. N.J. at 751.

## 2. *Malicious Interference by Atlas is Sufficiently Pled*

"[M]alicious interference—requires only the intentional doing of a wrongful act without justification or excuse." *Avaya Inc.*, 838 F.3d at 383 (internal quotes/cites omitted). "Wrongful conduct [is] always viewed in the specific context . . . . It is conduct that would not be sanctioned by the rules of the game." *Id.* (internal quotes/cites omitted). "Malice is determined on an individualized basis, and the standard is flexible, viewing the defendant's actions in the context of the facts presented." *Industria De Alimentos Zenu S.A.S. v. Latinfood U.S. Corp.*, 679 F. Supp. 3d 53, 111 (D.N.J. 2023) (internal quotes/cites omitted). Here, "malice is not used in the literal sense requiring ill will . . . . Rather, malice is defined to mean that the harm was inflicted intentionally and without justification or excuse." *Dello Russo v. Nagel*, 358 N.J. Super. 254, 269 (App. Div. 2003) (internal quotes/cites omitted).

27

The requisite intent may be "the taking of improper action with knowledge that interference will probably result." *Velop, Inc. v. Kaplan*, 301 N.J. Super. 32, 49 (App. Div. 1997). "The line clearly is drawn at conduct that is fraudulent, dishonest, or illegal and thereby interferes[.]" *Lamorte Burns*, 167 N.J. at 307. Allegations that Atlas "acted out of [its] own self interest to enrich [itself] at the expense of [defendant] are sufficient assertions of intent and malice." *Austar Int'l Ltd. v. AustarPharma LLC,* 425 F. Supp. 3d 336, 359 (D.N.J. 2019).

As detailed, Atlas purposefully engaged in a fraudulent scheme to self-profit off Daniel's Law, and at the expense of Covered Persons and Alesco. Such self-interested conduct, i.e., holding back Assignors requests and launching its attack in a manner designed to frustrate compliance and interfere with Alesco's business gives rise to an inference of malice. Similarly, Atlas' misrepresentations and deceptive practices, obstruction, violations of terms, sidestepping of dedicated opt-out processes, targeting incorrect email inboxes, and inflating volume, support malice inferences.

### 3.    *Resulting Losses is Plausibly Pled*

For "loss and causation, there must be proof that if there had been no interference there was a reasonable probability that the victim of the interference would have received the anticipated economic benefits." *Avaya Inc.,* 838 F.3d at 383. "[I]t is sufficient that plaintiff prove facts which, in themselves or by the

inferences . . . drawn therefrom, would support a finding that, except for the tortious interference by the defendant with the plaintiff's business . . . , plaintiff would have consummated the sale and made a profit." *Id.*; *see also Printing Mart*, 116. N.J. 739.

Alesco pled foreseeable losses caused by Atlas' interference. Atlas' coordinated attack and subsequent reckless and obstructive conduct disrupted and interfered with Alesco's small business operations, disabled use, overwhelmed systems, and blocked customer communications. Alesco's forced diversion of resources, disruption of business operations, impairment ability to serve customers, interruption of interstate commercial activity, and actions to prevent further harm caused business and revenue losses, which would not have occurred but for Atlas' malicious interference. Alesco had a right to conduct its "business, calling, or occupation, free from undue influence or molestation" (*Lamorte Burns*, 167 N.J. at 305*; Printing Mart*, 116. N.J. at 751), and Atlas maliciously interfered with same.

### D.    Alesco Sufficiently Pled a Claim for Relief for Civil Conspiracy

"In New Jersey, civil conspiracy[9] is a tort comprised of four elements: (1) a combination of two or more persons; (2) a real agreement or confederation with a common design; (3) the existence of an unlawful purpose, or of a lawful purpose to be achieved by unlawful means; and (4) proof of special damages." *MaxLite, Inc. v.*

---

[9]  Civil conspiracy claims are evaluated under Rule 8's general pleading standard. *Hillsborough Rare Coins, LLC v. ADT LLC*, No. CV 16-916 (MLC), 2017 WL 1731695, at *12 (D.N.J. May 2, 2017).

*ATG Elecs., Inc.*, 193 F. Supp. 3d 371, 390 (D.N.J. 2016) (internal quotes/cite omitted).  "[A] plaintiff need not prove that the unlawful agreement was express or that each participant in the conspiracy knew the exact limits of the illegal plan or the identity of all participants, as long as plaintiff alleges that each participant shared in the general conspiratorial objective." *MaxLite, Inc. v. ATG Elecs., Inc.*, No. CV 15-01116, 2024 WL 4764685, at \*9 (D.N.J. Nov. 13, 2024) (internal quotes/cite omitted). Direct evidence is also not needed, only that the agreement "could be circumstantially inferred[.]" *Id.* (internal quotes/cite omitted). Civil conspiracy is not an independent tort; it is grounded in an underlying actionable wrong thereby requiring an overt act, which proximately causes damages. *Farris v. Cnty. of Camden*, 61 F. Supp. 2d 307, 330 (D.N.J. 1999). The focus is the underlying wrong, not the agreement itself. *Ewing v. Cumberland Cnty.*, 152 F. Supp. 3d 269, 301 (D.N.J. 2015). At the pleading stage, the nature of a conspiracy makes it impossible to provide the details.  *Philip Morris USA, Inc. v. Lee*, 481 F. Supp. 2d 742, 747 (W.D. Tex. 2006).  Moreover, the identity of all co-conspirators is not required as same may be unveiled in discovery so long as the facts give rise to the inference of an agreement.  *Freeman v. Giuliani*, No. CV 21-3354 (BAH), 2022 WL 16551323, at \*11 (D.D.C. Oct. 31, 2022).

As detailed above, Alesco alleged that Atlas acted in concert with others in the execution of its scheme. It could not have launched its attack and accessed

Alesco's systems and data alone. It is easily inferred, particularly giving all favorable inferences to Alesco, that Atlas and others agreed to commit an unlawful act, i.e., the actions detailed in violation of CFAA, CROA, tortious interference sections above. They took overt acts, i.e., the spam attack, misrepresentations, obstruction of compliance, unauthorized access, and Alesco suffered resulting damages. Alesco has satisfied its Rule 8 plausibility pleading standard for a claim of civil conspiracy. As such, Atlas' motion must be denied.

## V.    CONCLUSION

For the reasons set forth herein, Alesco respectfully requests that Atlas' motion to dismiss its counterclaims be denied in its entirety.

Dated February 3, 2026                **GREENSPOON MARDER LLP**

*/s/Kelly Purcaro*
Kelly M. Purcaro, Esq.
Kory Ann Ferro, Esq.
One Gateway Center, Suite 2600
Newark, New Jersey 07102
Tel.: (732) 456-8734 or 8746
Kelly.Purcaro@gmlaw.com
KoryAnn.Ferro@gmlaw.com
*Attorneys for Defendant The Alesco Group,*
*L.L.C.*

63707589v1